162 P.3d 382 (2007)
Gordon H. CRAFTS and Jaymie V. Crafts, husband and wife, Respondents,
v.
David PITTS, an individual, Petitioner.
No. 78564-3.
Supreme Court of Washington, En Banc.
Argued March 15, 2007.
Decided July 19, 2007.
*383 Peter A. Witherspoon, Spokane, WA, for Respondents.
Robert Powers Hailey, Spokane, WA, for Petitioner.
SANDERS, J.
¶ 1 We are asked to decide whether Gordon and Jaymie Crafts' action for specific performance of a real property contract was discharged by a federal bankruptcy court. David Pitts contracted to execute a quitclaim deed for 9.83 acres of land to be held in escrow for delivery to Glen Cloninger if Pitts either defaulted on a lease or the lease expired before Pitts exercised his option to purchase. On August 31, 2002 the lease expired but Pitts refused to execute and deliver the deed to Cloninger. Cloninger *384 then sold his interest in the land to Gordon and Jaymie Crafts, and they sued Pitts for specific performance. Pitts filed for chapter 7 bankruptcy and the bankruptcy court discharged Pitts' debts.
¶ 2 However, a bankruptcy court cannot discharge an equitable claim if there is no adequate remedy at law to compensate the injured party. Both the superior court and the Court of Appeals held the Crafts had such a claim, ordering Pitts to quitclaim his interest in the land. We agree. These 9.83 acres are unique; money damages cannot adequately and completely satisfy the Crafts, and the equitable claim for specific performance under these facts is not discharged in bankruptcy.

FACTS
¶ 3 We deal with a dispute over who owns a 9.83 acre parcel. This parcel is adjacent to a larger 160 acre parcel, which is currently owned by Gordon and Jaymie Crafts. Over the years the 160 acre parcel has seen numerous owners,[1] but Betty Pitts had legal title to the 9.83 acres at all relevant times.[2] Despite the 160 acres' various owners, David Pitts remained living on the land. Then in November 2001 Glen Cloninger purchased the 160 acres. On March 14, 2002, Cloninger and Pitts reached an agreement entitled, "REAL ESTATE LEASE WITH PURCHASE OPTION." Clerk's Papers (CP) at 74. According to the lease, Pitts kept possession of the entire 160 acres for a six-month period at $1,000 a month. This was intended to give Pitts time to raise capital and buy the 160 acres. A signed quitclaim deed was to be executed and held in trust immediately after both parties signed the lease. If Pitts did not exercise his purchase option before the lease expired, or he defaulted, the deed would be delivered to Cloninger for the additional 9.83 acres. Specifically, the lease provided:
Contemporaneously upon execution of this agreement Lessee shall execute a Quit Claim Deed conveying to Lessor any interest of Lessee in said property which deed *385 shall be held in trust by Peter A. Witherspoon, Attorney at Law. In the event Lessee defaults under the foregoing lease and/or fails to exercise the purchase option provided herein said deed shall be released to Lessor upon the termination of expiration of the lease.
CP at 78. Pitts never executed nor deposited the deed in trust as promised. The lease expired on August 31, 2002, absent Pitts either purchasing the property or renewing the lease.
¶ 4 On April 1, 2003, Cloninger conveyed the 160 acres to Gordon and Jaymie Crafts. Then on September 24, 2003, Cloninger also signed a separate "ASSIGNMENT OF INTEREST," which conveyed his interest in the real estate lease to the Crafts, specifically for the 9.83 acres of land. CP at 86. On the same day the Crafts sued Pitts for specific performance. In March 2004 Pitts filed bankruptcy, and in June 2004 the bankruptcy court discharged Pitts' debts. At that point the Crafts moved for summary judgment in their state action seeking specific performance on the 9.83 acres. The trial court granted the Crafts summary judgment and specific performance, ordering Pitts to quitclaim the 9.83 acres. After the Court of Appeals affirmed, Pitts sought and obtained our review on whether the bankruptcy court discharged Crafts' action for specific performance.

ANALYSIS
¶ 5 There are no disputed facts. The only issue  whether the Crafts' claim for equitable relief was discharged in bankruptcy  is an issue of law, which we review de novo. See Niemann v. Vaughn Cmty. Church, 154 Wash.2d 365, 374, 113 P.3d 463 (2005).
A. An equitable claim survives a bankruptcy discharge if there is no alternative right to money damages
¶ 6 After he successfully completed a chapter 7 bankruptcy proceeding, all of Pitts' debts and liabilities on any "claims" were discharged.[3] 11 U.S.C. § 727. A discharge is simply a perpetual injunction that prevents creditors from attempting to collect on a past debt. Specifically, federal law provides:
[A] discharge under subsection (a) of this section discharges the debtor from all debts that arose before the date of the order for relief under this chapter, and any liability on a claim that is determined under [11 U.S.C. § 502] as if such claim had arisen before the commencement of the case. . . .
11 U.S.C. § 727(b). A "claim" is explicitly defined by bankruptcy law. An action seeking equitable relief for breach of contract is discharged only "if such breach gives rise to a right to payment." 11 U.S.C. § 101(5)(B). In other words, a right to specific performance (or any other equitable remedy) will not be discharged if money damages will not remedy the breach as much as specific performance. Bankruptcy courts look to underlying state law and the contract itself to determine whether there was an alternative right to money damages that would at least equally compensate the claimant. Grogan v. Garner, 498 U.S. 279, 283, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).
¶ 7 We must determine (1) whether the Crafts had a right to specific performance; and (2) if there was such a right, was there an alternative right of money damages that would adequately and completely satisfy the Crafts' claim.
B. The Crafts had a right to specific performance because money damages cannot adequately compensate for the loss of a unique parcel of land
¶ 8 "Equity will not suffer a wrong to be without a remedy." Manning v. Potomac Elec. Power Co., 230 Md. 415, 422, 187 A.2d 468, 472 (1963). Specific performance is one such remedy that, like all equitable remedies, strives to do perfect justice. Montana Co. v. St. Louis Mining & Milling Co., 152 U.S. 160, 167, 14 S.Ct. 506, 38 L.Ed. *386 398 (1894) ("The very great powers with which a court of chancery is clothed were given it to enable it to carry out the administration of nicer and more perfect justice than is attainable in a court of law."); Huntt v. Gov't of Virgin Islands, 382 F.2d 38 (3d Cir.1967). When a court's legal powers cannot adequately compensate a party's loss with money damages, then a court may use its broad equitable powers to compel a party to specifically perform its promise. RESTATEMENT (SECOND) OF CONTRACTS § 360 (1981). When determining whether damages would provide adequate compensation, courts inquire as to (i) the difficulty of proving damages with reasonable certainty, (ii) the difficulty of procuring a suitable substitute, and (iii) the likelihood that an award of damages could not be collected. RESTATEMENT, supra, § 360.[4] Furthermore, because specific performance is uniquely a contract remedy, a trial court may order specific performance only if there is a valid binding contract; a party has committed or is threatening to commit a breach of its contractual duty; the contract has definite and certain terms; and the contract is free from unfairness, fraud, and overreaching. Egbert v. Way, 15 Wash.App. 76, 79, 546 P.2d 1246 (1976); 71 AM.JUR.2D Specific Performance § 9 (2001). Lastly, a court should ensure enforcement will not be oppressive, unconscionable, or result in undue hardship to any party involved. 71 AM. JUR.2D Specific Performance § 9.
¶ 9 We have also recognized specific performance is a suitable remedy to enforce a lease provision.[5]Barnett v. Buchan Baking Co., 108 Wash.2d 405, 738 P.2d 1056 (1987) (holding specific performance was appropriate to enforce an option to purchase contained in a lease); Feigenbaum v. Brink, 66 Wash.2d 125, 130-31, 401 P.2d 642 (1965) (holding "specific performance will lie to enforce the landlord's duty to repair"); Carpenter v. Folkerts, 29 Wash.App. 73, 76, 627 P.2d 559 (1981) ("It is accepted in Washington that a lease containing a lessee's option to purchase is enforceable by specific performance."); see also 71 AM.JUR.2D Specific Performance § 168 (2001) ("[E]quity will, in a proper case, exercise its jurisdiction to enforce specific performance of covenants in a lease, the violation of which is not adequately remediable by an action at law."). And federal bankruptcy courts have similarly recognized specific performance is an appropriate remedy to enforce a lease provision. In re Ground Round, Inc., 335 B.R. 253, 263 (2005) (landlord had a right under state law to specifically enforce a provision of the lease requiring lessee to transfer his liquor license to the landlord and such right survived discharge).
¶ 10 The trial court was well within its power to grant the Crafts' request for specific performance to both enforce a conveyance of real property and enforce a lease provision for which there was no adequate remedy at law. Pitts' contractual duty to deliver a quitclaim deed to Cloninger in the 9.83 acres was breached either when Pitts defaulted on his lease or his lease expired absent purchase.[6]
*387 C. There is no viable alternative of money damages to satisfy the Crafts' right to specific performance
¶ 11 Pitts admits all of this but argues the Crafts' claim could be satisfied with money. But damages cannot adequately and completely compensate the Crafts for loss of this adjoining acreage. It is well established that a court may use its equitable powers to order a party to convey land. See RESTATEMENT, supra, § 360 cmt. e ("Contracts for the sale of land have traditionally been accorded a special place in the law of specific performance. A specific tract of land has long been regarded as unique and impossible of duplication by the use of any amount of money."). The rationale underpinning this rule is not only that land is unique but also difficult to value, thus money may not adequately compensate a party when one fails to convey real property as promised.[7]Carpenter, 29 Wash.App. at 76, 627 P.2d 559. "No piece of land has its counterpart anywhere else and it is impossible to duplicate by the expenditure of any amount of money." Id. (citing 71 AM. JUR.2D Specific Performance § 112 (1973)); see also 71 AM.JUR.2D Specific Performance § 11 (2001) ("[I]n the case of contracts for the sale of real estate, it is presumed by the courts that the remedy at law is inadequate, due to the nature of the subject matter, because no two parcels of real estate are the same.").
¶ 12 But we need not decide whether every parcel of land is unique, only whether this particular parcel of land is unique. These 9.83 acres abut the 160 acres already owned by the Crafts. See Egbert, 15 Wash.App. at 79, 546 P.2d 1246 (ordering specific performance after finding property was unique because it adjoined a family farm). Furthermore, the additional acreage has always been considered part of the entire parcel: the original owners, the Kennedys, sued for adverse possession, the entire area was enclosed by a single fence, and a well that provided water to the entire parcel was located on the 9.83 acres. There is no other piece of land identical to these 9.83 acres, and no amount of money will make the Crafts' property whole.[8] Moreover, this contract contemplated delivery of a quitclaim deed into trust from its inception.
¶ 13 Pitts argues it was possible for the Crafts to elect money damages instead *388 of specific performance and therefore the claim was discharged. But the injured party in a land conveyance dispute always has a choice between specific performance and money damages. Kritzer v. Moffat, 136 Wash. 410, 423, 240 P. 355 (1925). This does not mean bankruptcy will convert his election of specific performance into a dischargeable claim. Such a holding would require all claims for specific performance to be discharged, rendering 11 U.S.C. § 101(5)(B) meaningless. "The mere fact that a party can get some relief at law does not prevent a court from issuing a decree requiring specific performance. To preclude specific performance, the remedy afforded at law must be as plain, adequate, complete, and efficient as the remedy of specific performance. . . ." 71 AM.JUR.2D Specific Performance § 11 (emphasis added) (footnote omitted).
¶ 14 Federal courts have construed 11 U.S.C. § 101(5)(B) not to force a party to choose an inferior remedy. While we must determine the contours of Washington state law regarding to specific performance, construction of the Bankruptcy Code statutes is governed by federal law. Grogan, 498 U.S. at 284, 111 S.Ct. 654 ("[T]he issue of nondischargeability has been a matter of federal law governed by the terms of the Bankruptcy Code.") (citing Brown v. Felsen, 442 U.S. 127, 129-30, 136, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979)).
¶ 15 In Sheerin v. Davis, 3 F.3d 113 (5th Cir.1993) the debtor pressed the same argument Pitts makes today. But the Fifth Circuit was unconvinced:
The ability of a debtor to choose between performance and damages in some cases is not the same as a debtor's liability for money damages for failing to satisfy an equitable obligation. While section 101(5)(B) encourages creditors to select money damages from among alternative remedies, it does not require creditors entitled to an equitable remedy to select a suboptimal remedy of money damages.
Id. at 116-17 (citations omitted); see also In re Udell, 18 F.3d 403, 408 (7th Cir.1994); In re Chateaugay Corp., 944 F.2d 997, 1007-08 (2d Cir.1991); In re Indian River Estates, Inc., 293 B.R. 429, 434 (Bankr.N.D.Ohio 2003) ("[11 U.S.C. §] 101(5)(B) does not require that a party accept a monetary alternative if it is clearly not in proportion to the equitable remedy."); In re Mitchell, 249 B.R. 55, 60 (Bankr.S.D.N.Y.2000) ("The availability of the monetary remedy, however, does not automatically mean that damages are an adequate alternative under state law. . . ."). The question is always whether money damages would equally compensate the injured party  not merely whether they are available.[9] For instance, in In re Ward, 194 B.R. 703, 712 (Bankr.D.Mass.1996), the bankruptcy court found Maids' action for an injunction was discharged because the court could approximate the damages for breaching a covenant to compete by computing loss of future profits, and therefore "[a]s an alternative remedy, this right to payment permits a dollar sign to be placed on the equitable remedy." However here, due to the unique nature of these 9.83 acres in particular, there can be no calculation of the future value of *389 the land and no dollar sign can be placed on the Crafts' equitable remedy.
¶ 16 While the Crafts could have elected, at their discretion, to seek damages, they chose specific performance believing it to be the only adequate remedy.[10] While a decree of specific performance rests within the sound discretion of the trial court, this does not permit a court to deny specific performance when otherwise appropriate. See Egbert, 15 Wash.App. at 79, 546 P.2d 1246 (reversing the superior court's denial of specific performance); O.K. Tire & Rubber Co. v. Oswald, 166 N.W.2d 749, 752 (Iowa 1969) ("In a proper case, however, [specific performance] is not to be denied unless some good reason is shown for so doing."); 71 AM.JUR.2D Specific Performance § 9 ("Thus, although the court in a specific performance case has a wide measure of discretion in awarding or denying the remedy, that discretion may not be abused or exercised arbitrarily. . . ." (footnotes omitted)).
¶ 17 Bankruptcy courts will also consider whether the contract itself gives rise to a money damages alternative. Abboud, 335 B.R. at 263 ("The lease of the Property contains no language that could be construed as creating a right to money damages. Therefore, the rights of the Landlord do not constitute a claim and cannot be discharged."). Nothing in this lease either creates a right to money damages or suggests the Crafts agreed to forgo their right to specific performance.[11] Quite the contrary, this lease specifically required transfer of a quitclaim deed to be held in trust immediately after the lease was signed, and then transferred to Cloninger if Pitts either defaulted or the lease expired prior to purchase.
¶ 18 The trial court did not abuse its discretion when it ordered Pitts to quitclaim his interest in the 9.83 acres. The contract, which contained clear and definite terms, was breached by Pitts. Because these 9.83 acres are unique there is no adequate remedy at law, and compelling Pitts to quitclaim his interest helps the Crafts achieve perfect justice.
¶ 19 We hold the Crafts' action for specific performance survived the discharge of Pitts' debts by the bankruptcy court and, accordingly, affirm the Court of Appeals.
WE CONCUR: TOM CHAMBERS, CHARLES W. JOHNSON, SUSAN OWENS, BARBARA A. MADSEN, MARY E. FAIRHURST, JAMES M. JOHNSON, BOBBE J. BRIDGE, Justices, and CHRISTINE QUINN-BRINTNALL, Justice Pro Tem.
NOTES
[1] Though the 160 acre parcel is not at issue in this case, understanding these conveyances is necessary to understand who owns the 9.83 acres. In 1990, John and Ruth Kennedy owned the 160 acre parcel in Spokane County and sold the property to Betty Pitts. Shortly thereafter, it was discovered the property was not square as originally thought and the Kennedys sued for adverse possession of the adjacent parcel, quieted title in the additional 9.83 acres (the focus of this litigation), and quitclaimed their interest in the 9.83 acres to Betty Pitts. In June 1993 Betty Pitts deeded the property to her son, David Pitts. But the deed's description refers solely to the 160 acres; therefore she retained legal title to the 9.83 acres.

In 1999 Pitts executed a contract to sell the 160 acres to Mr. V. Ram Gopal. The statutory warranty deed was inadvertently delivered to Gopal before Gopal executed a corresponding deed of trust to secure his obligation to pay. To resolve the dispute, Gopal agreed to pay a portion of the price to Pitts for 110 acres and return the 50 acres Pitts was living on. Neither their agreement nor a deed was ever recorded. Instead Gopal transferred the entire 160 acres to Kenneth Lohmeyer in March 2000. In January 2001, in lieu of foreclosure, Lohmeyer quitclaimed the property to Partners Development LLC. In November 2001 Partners quitclaimed the 160 acres to Glen Cloninger during another foreclosure action. Cloninger eventually sold the 160 acres to the Crafts, who now own the property. Throughout the various conveyances and foreclosures of the 160 acres, David Pitts remained on the land, believing he still owned 50 of the 160 acres pursuant to his agreement with Mr. V. Ram Gopal. After Cloninger purchased the 160 acres, he informed Pitts that Gopal never properly recorded the deed and now he, Cloninger, owned the entire 160 acres.
[2] Betty Pitts, passed away in 1999, and at the time of this briefing her will was still in probate. Presumably, the 9.83 acres will be distributed to Betty Pitts' heirs through the residuary clause of her will. David Pitts is one of those heirs. However, this uncertainty as to how much, if any, interest David Pitts has or will have in the 9.83 acreage does not defeat the Crafts' action for specific performance. A quitclaim deed, unlike a warranty deed, transfers only the interest the grantor has in the subject property. Scramlin v. Warner, 69 Wash.2d 6, 416 P.2d 699 (1966). The grantor makes no assurances to the grantee that he actually has good title to, or even any interest in, the property. Id.; see also RCW 64.04.050. Nevertheless, a quitclaim deed is still as effective as any deed in conveying title. McCoy v. Lowrie, 44 Wash.2d 483, 268 P.2d 1003 (1954). Furthermore, Pitts may also quitclaim any future interest he has in the property. Ankeny v. Clark, 1 Wash. 549, 20 P. 583 (1889), aff'd, 148 U.S. 345, 13 S.Ct. 617, 37 L.Ed. 475 (1893); but see Brenner v. J.J. Brenner Oyster Co., 48 Wash.2d 264, 292 P.2d 1052 (1956) (holding an habendum clause in a quitclaim deed does not convey after-acquired title).
[3] An automatic stay prevents creditors from collecting against the debtor during the pendency of the bankruptcy proceeding. 11 U.S.C. § 362.
[4] The Restatement (Second) of Contracts details other restrictions on specific performance, though none are pertinent here. RESTATEMENT, supra, §§ 361-369. Additionally, the well-known equitable defenses of estoppel, laches, and unclean hands are available to any defendant against whom performance is sought. Cascade Timber Co. v. N. Pac. Ry. Co., 28 Wash.2d 684, 711, 184 P.2d 90 (1947). However, no such defenses are alleged.
[5] Aside from leases, specific performance is recognized in a variety of other contexts. RCW 14.08.200(12) (stating contract between two municipalities for joint airport operations may be enforced by specific performance); RCW 15.66.210(2) (stating a party may specifically enforce a provision of the Washington State Agricultural Commodity Commission); RCW 24.36.450 (stating the provisions of the Fish Marketing Act may be enforced by specific performance); RCW 88.46.070 (stating the prevention plans of the vessel oil spill prevention and response act may be enforced by specific performance); Golden v. McGill, 3 Wash.2d 708, 102 P.2d 219 (1940) (recognizing it is within the power of a probate court to order specific performance of a contract to devise property); Lucopoulos v. Sotriopoulos, 111 Wash. 400, 191 P. 149 (1920) (holding specific performance of a contract to form a partnership will be decreed only under special circumstances); Carpenter v. Brackett, 57 Wash. 460, 107 P. 359 (1910) (holding specific performance of a settlement contract in the dissolution of a marriage is appropriate).
[6] Actually, Pitts breached his duty to execute and deposit the quitclaim deed in trust long before that.
[7] Others argue the motivation behind specific performance being the presumed remedy for land is deeper than land merely being unique or being difficult to value. Professor Cohen examines English history and early contract cases to develop a broader understanding beyond uniqueness and valuation problems. David Cohen, The Relationship of Contractual Remedies to Political and Social Status: A Preliminary Inquiry, 32 U. TORONTO L.J. 31 (1982). He argues the ancient relationship between land ownership and political identity, legal authority, and social status gave parcels of land paramount importance. Id. at 39. This integral relationship between land and status drove the development of early English contract law to carve out special remedies for landholders. Whatever the rationale, however, it is clear when a party breaches a contract to convey real property, the presumptive remedy is specific performance. 71 AM.JUR.2D Specific Performance § 133 (2001); see Jacobson v. Gulbransen, 2001 SD 33, 623 N.W.2d 84, 91 (2001) ("Specific performance is `[t]he presumed remedy for the breach of an agreement to transfer real property.'") (quoting Wiggins v. Shewmake, 374 N.W.2d 111, 115 (S.D.1985)).
[8] At oral argument, Pitts' counsel claimed if we allow the Crafts' specific performance claim to stand, then a bankruptcy court could never discharge a real property conveyance. But the language of the contract itself can always give rise to monetary damages, and often a party will choose damages over specific performance. See Zastrow v. W.G. Platts, Inc., 57 Wash.2d 347, 357 P.2d 162, 360 P.2d 354 (1960) (awarding money damages instead of specific performance because the property had been encumbered to a point where specific performance was not feasible). Conversely, were we to agree with counsel's argument, then the bankruptcy court would always discharge a specific performance claim and leave parties without recourse to equitable remedies that would otherwise be due. As Professor Andrew Kull rightly observes:

Bankruptcy and the common law of property share the objective of determining what is the property of the debtor, and therefore of the estate, and what is the property of others. Bankruptcy respects the common-law determination of property rights  because the courts have said so, and because any failure to do so would either deprive the creditors of assets properly subject to their claims, or else satisfy those claims with assets belonging to someone else.
Andrew Kull, Restitution in Bankruptcy: Reclamation and Constructive Trust, 72 AM. BANKR. L.J. 265, 301 (1998).
[9] Pitts focuses solely on one decision by a bankruptcy court, In re Asian, 65 B.R. 826, 830-31 (Bankr.D.Cal.1986), which opined: "The question to be dealt with is whether, as a matter of state law, the non-breaching party to the contract has a right to obtain a money judgment, even though he also has a right to obtain an equitable judgment. If so, the remedy becomes a contingent claim and can be discharged in the bankruptcy." This trial court language goes further than most federal circuits and seemingly ignores an important aspect of the analysis  whether the money judgment would be equal to the equitable relief. See In re Udell, 18 F.3d 403, 408 (7th Cir.1994) ("If the right to payment is an `alternative' to the right to an equitable remedy, the necessary relationship clearly exists, for the two remedies would be substitutes for one another."); In re Indian River Estates, Inc., 293 B.R. 429, 434 (Bankr.N.D.Ohio 2003) ("The key therefore, in determining whether an equitable remedy gives rise to a claim under bankruptcy law is to ascertain whether the equitable remedy would also give rise to a right to payment; that is, could a monetary award substitute for the equitable remedy."). Even if we were to agree with Aslan's broad reasoning it would be inapplicable here because the Aslan court addressed the rejection of an executory contract under the bankruptcy code which it found shifted the choice of remedy from the creditor to the debtor. Aslan, 65 B.R. at 831. Here there has been no shift of remedy choice to the creditor. Money damages are not a viable alternative for the Crafts since money cannot adequately substitute for the 9.83 acres or make their property whole.
[10] Because the Crafts also sought "further or additional relief which the court finds equitable, appropriate or just," CP at 5, Pitts argues the Crafts complaint could be satisfied with money damages. This boilerplate language, however, is insufficient to show the Crafts thought money was an adequate remedy.
[11] Pitts argues lease language that says if he defaults on a rent payment the "Lessor may, at his option and without prejudice to the exercise of any other remedies which may be available to him, treat the lease as terminated." CP at 74. This pertains only to a default and does not obviate the Crafts' specific performance right.