242 P.3d 1 (2010)
CORNISH COLLEGE OF THE ARTS, a Washington public benefit corporation, Respondent,
v.
1000 VIRGINIA LIMITED PARTNERSHIP, a Washington limited partnership; One Thousand Virginia, a general partnership; and Donn Etherington, Jr., an individual, Appellants.
Nos. 63790-8-I, 63792-4-I.
Court of Appeals of Washington, Division 1.
October 25, 2010.
*5 Jerry H. Kindinger, Wendy S. Moullett, Ryan Swanson & Cleveland PLLC, Seattle, WA, Charles K. Wiggins, Kenneth W. Masters, Shelby R. Frost Lemmel, Wiggins & Masters PLLC, Bainbridge Island, WA, for Appellants.
Richard C. Yarmuth, Rachel Hong, Jordan Gross, Yarmuth Wilsdon Calfo, Seattle, WA, for Respondent.
DWYER, C.J.
¶ 1 A superior court has the authority to grant an equitable grace period to the holder of an option to purchase property when an inequitable forfeiture would otherwise result. When monetary damages are inadequate to compensate a nonbreaching party, a lease containing an option to purchase is enforceable by specific performance. Properly finding that Cornish College of the Arts would otherwise suffer an inequitable forfeiture, the trial court herein granted to Cornish an equitable period of grace. Because a suitable substitute for the disputed property would be highly difficultif not impossibleto procure, the trial court correctly awarded to Cornish specific performance of the option to purchase. Moreover, the trial court did not err in awarding to Cornish consequential damages, given that an award of consequential damages in addition to specific performance is permissible when necessary to make the nonbreaching party whole. The trial court erred, however, in finding defendant Donn Etherington, Jr. jointly and severally liable for Cornish's attorney fees and costs. Accordingly, we affirm as to the substantive claims raised below, and we affirm in part and reverse in part as to the award of attorney fees and costs.

I
¶ 2 Cornish College of the Arts is a private, nonprofit college offering bachelor's degrees in the visual and performing arts. *6 1000 Virginia Limited is a Washington limited partnership. Its sole asset, and the property which is the subject of this dispute, is a parcel of real property at 1000 Virginia Street in Seattle. Donn Etherington, Jr. is the managing member of Virginia-Terry, LLC, which is the general partner of Virginia Limited.[1] Etherington manages the property at 1000 Virginia Street.
¶ 3 In April 2005, Cornish and Virginia Limited executed the "Commercial Sublease with Option to Purchase" (the Agreement). The Agreement provided for Cornish to sublease the bottom two floors of the six-story building located at 1000 Virginia Street from Etherington, who was in turn leasing the property from Virginia Limited. The lease term of 42 months was to terminate on December 31, 2008.
¶ 4 The Agreement also granted to Cornish an option to purchase the entire building and the land at 1000 Virginia Street. Pursuant to the Agreement, Cornish could exercise this option through December 2006 for a purchase price of $3 million due at closing.[2] The Agreement provided that Cornish could extend the option period for an additional year by paying a deposit of $50,000 by January 1, 2007. If Cornish exercised its option to purchase, Virginia Limited was required to deliver clear title to the property and to demolish the upper four floors of the building.
¶ 5 The Agreement also provided for early termination by either party in the event of "substantial destruction" of the property. The pertinent provision states:

Substantial Destruction. If the damage to the Leased Premises is so substantial that repair of such damage will require more than 180 days to complete (or will require more than 90 days to complete if such casualty occurs after January 1, 2008), then either Etherington or Lessee may elect, by written notice given to the other not later than thirty (30) days after the date of such casualty, to terminate this Lease effective as of the date of such casualty.
This provision was presumably included due to the poor condition of the building.[3]
¶ 6 Finally, the Agreement included an attorney fees provision, which provides:
In the event that Cornish College, Etherington, or Virginia Limited shall commence proceedings or institute action to enforce any rights hereunder . . . the substantially prevailing party shall be entitled to costs and reasonable attorney's fees, including those for appeal.
¶ 7 The Agreement between Cornish and Virginia Limited was not, however, the only contractual obligation affecting the property at 1000 Virginia Street. The property was also subject to an agreement with the Washington State Housing Finance Commission (WSHFC), pursuant to which Virginia Limited was obligated to provide low-income housing in the top four floors of the building for a certain term of years. In exchange, Virginia Limited would annually receive nearly $400,000 in tax credits for 10 years.
¶ 8 During the parties' negotiations, Etherington told Cornish that the obligation to provide low-income housing would end on December 31, 2007. In fact, Virginia Limited's obligation pursuant to its agreement with the WSHFC was to run through 2022. After discovering thisand believing that Virginia Limited's obligation to provide low-income housing would prevent Etherington *7 from delivering clear title as required by the option agreementCornish representatives met with "attorneys, engineering consultants, housing groups and other interested parties, trying to find a way to help Mr. Etherington meet his obligations to deliver clear title."
¶ 9 On December 18, 2006, Cornish's chief financial officer, Jeff Riddell, requested disbursement of a $50,000 check to extend the option period through December 31, 2007. Riddell intended to give the check to Etherington at a meeting on December 28. Riddell testified that when the meeting did not occur, he returned the check to his briefcase upon seeing that the postage meter at the college had already been set ahead to January 1. Riddell mailed the check on January 5. The payment to extend Cornish's option to purchase was, therefore, a few days late. The check contained only one signature, despite language on the check indicating that two signatures were required for amounts greater than $7,500. Etherington rejected the check, returning it to Cornish later that month.
¶ 10 Subsequently, a July 2007 appraisal commissioned by Etherington estimated that the value of the property, which was priced at $3 million in the Agreement, had risen to $7.7 million due to zoning changes by the city of Seattle.
¶ 11 In December 2007, Cornish attempted to exercise its option to purchase, maintaining that its late extension payment, though returned by Etherington, had extended the option period. Cornish included a check for $50,000, stating that it was an amount to which Etherington was entitled, given that the option was extended. Virginia Limited rejected Cornish's attempt to exercise the option, stating that Cornish had not timely extended the option.
¶ 12 Also in December 2007, Virginia Limited's structural engineer sent a letter to Etherington stating that certain parts of the building had deteriorated to a "dangerous" level. Four months laternine months before the lease term endedEtherington delivered to Cornish a "Notice of Lease Termination" ordering Cornish to vacate the premises. In a letter accompanying this notice, Etherington cites the "deterioration noted by our engineer in late December" as the event precipitating the eviction notice. Cornish fully vacated the premises by July 2008. Cornish then leased and renovated three separate spaces for classrooms and studios in order to replace its former space at 1000 Virginia Street.
¶ 13 Cornish sued Virginia Limited and Etherington, seeking specific performance of the option to purchase and damages for wrongful eviction. Virginia Limited and Etherington asserted counterclaims for breach of the lease, tortious interference with economic relations, and slander of title, all of which were dismissed by the trial court.
¶ 14 The trial court disposed of Cornish's substantive claims on summary judgment in favor of Cornish. The trial court granted to Cornish an equitable period of grace for the late option payment and ordered that the property be conveyed according to the terms of the parties' agreement. Although the trial court initially ordered both Etherington and Virginia Limited to convey the property, it later struck Etherington from the order because it found that he had no legal ownership of the property. The trial court, on summary judgment, found both Etherington and Virginia Limited liable for wrongful eviction.
¶ 15 Subsequent to the trial court's grant of an equitable grace period and award of specific performance to Cornish, Virginia Limited filed for bankruptcy. In its petition, Virginia Limited sought to reject its agreement with Cornish.[4] The bankruptcy court denied Virginia Limited's motion to reject the Agreement, and the bankruptcy petition was dismissed. The bankruptcy court found that the filing "was a litigation tactic rather than a bona fide effort to reorganize." Cornish incurred approximately $55,000 in attorney fees litigating against Virginia Limited's bankruptcy petition.
*8 ¶ 16 Rather than proceed with a jury trial on the issue of damages for wrongful eviction, the parties stipulated that, were a jury asked to determine such damages, Cornish would be entitled to damages in the amount of $69,600. They further stipulated that Virginia Limited and Etherington were jointly and severally liable for that amount, subject to the defendants' right to appeal the liability judgment.
¶ 17 The case then proceeded to trial on those issues not resolved by summary judgment. After a three day bench trial, the trial court found that specific performance was inadequate to make Cornish whole and, thus, it additionally awarded to Cornish approximately $2.4 million in money damages. This amount, the trial court determined, was "necessary to place Cornish in the position it would have been in had the [Agreement] been performed according to its terms." The trial court found that rental payments of over $1.7 million and renovation costs of almost $700,000 to replace Cornish's lost use of the 1000 Virginia property were reasonable and necessary expenses. In calculating consequential damages, the trial court determined that the damages "begin to flow . . . from the date upon which performance should have occurred had the option been recognized by the owner."
¶ 18 Posttrial, the trial court found that Cornish was the only "substantially prevailing party" pursuant to the attorney fees provision in the Agreement. The trial court awarded to Cornish over $640,000 in attorney fees and costsincluding those incurred litigating against Virginia Limited's bankruptcy petitionand found Virginia Limited and Etherington jointly and severally liable for the full amount of attorney fees and costs.
¶ 19 Virginia Limited appeals, assigning error to the grant of an equitable grace period, the order of specific performance, the wrongful eviction judgment, the award of consequential damages, and the dismissal of the tortious interference counterclaim. Virginia Limited further appeals from the award of attorney fees and costs. Etherington appeals, assigning error to the wrongful eviction judgment and the attorney fees award.

II
¶ 20 "The de novo standard of review is used by an appellate court when reviewing all trial court rulings made in conjunction with a summary judgment motion." Folsom v. Burger King, 135 Wash.2d 658, 663, 958 P.2d 301 (1998). In reviewing an order for summary judgment, we engage in the same inquiry as the trial court. Folsom, 135 Wash.2d at 663, 958 P.2d 301. Summary judgment is properly granted where the pleadings, affidavits, depositions, and admissions on file demonstrate "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). A material fact "`is a fact upon which the outcome of the litigation depends, in whole or in part.'" Lamon v. McDonnell Douglas Corp., 91 Wash.2d 345, 349, 588 P.2d 1346 (1979) (quoting Morris v. McNicol, 83 Wash.2d 491, 494-95, 519 P.2d 7 (1974)). All evidence must be considered in the light most favorable to the nonmoving party, and summary judgment may be granted only where there is but one conclusion that could be reached by a reasonable person. Lamon, 91 Wash.2d at 349-50, 588 P.2d 1346 (quoting Morris, 83 Wash.2d at 494-95, 519 P.2d 7).

III
¶ 21 Virginia Limited first contends that the trial court erred by granting to Cornish an equitable grace period within which to extend the option to purchase. Virginia Limited asserts that, as a threshold issue, Cornish is not entitled to any form of equitable relief. Virginia Limited then asserts that, even if Cornish is entitled to equitable relief, no exception to the general rule of strict contract enforcement applies in this case. We disagree with both contentions.
¶ 22 Equity jurisprudence requires the party seeking equitable relief to have acted in good faith and to come into equity with clean hands. Cascade Timber Co. v. N. Pac. Ry. Co., 28 Wash.2d 684, 711, 184 P.2d 90 (1947) (quoting 49 Am.Jur. 10, § 6). Virginia Limited posits several ways in which Cornish acted inequitably, including Cornish's alleged *9 attempts to "renegotiate" the option and to seek "substantial concessions." However, despite its fervent insistence that Cornish acted inequitably, Virginia Limited provides no facts to support this assertion. See Snohomish County v. Rugg, 115 Wash.App. 218, 224, 61 P.3d 1184 (2002) (holding that to raise a genuine issue of material fact, a party opposing summary judgment must set forth "facts evidentiary in nature, i.e., information as to what took place, an act, an incident, a reality as distinguished from supposition or opinion"). Instead, the evidence supports Cornish's contention that its alleged efforts to "renegotiate" the contract were "made in light of the increasingly apparent likelihood that defendants would not be willing to . . . fulfill their contractual obligation to deliver to Cornish clear title to the property" due to the low-income housing restrictions. Virginia Limited failed to set forth evidentiary facts sufficient to raise a genuine issue of material fact regarding Cornish's alleged inequitable conduct. Thus, the trial court did not err by concluding that Cornish was entitled to equitable relief.[5]
¶ 23 Even where a party is entitled to equitable relief, the grant of an equitable grace period is appropriate only in limited circumstances. As a general rule, option contracts "are to be strictly construed and time is of the essence." Pardee v. Jolly, 163 Wash.2d 558, 572, 182 P.3d 967 (2008). However, equitable relief from such strict construction may be warranted in limited circumstances where an inequitable forfeiture would otherwise result. Wharf Rest., Inc. v. Port of Seattle, 24 Wash.App. 601, 611, 605 P.2d 334 (1979). This is because "`[f]orfeitures are not favored in law and are never enforced in equity unless the right thereto is so clear as to permit no denial.'" Pardee, 163 Wash.2d at 574, 182 P.3d 967 (alteration in original) (internal quotation marks omitted) (quoting Hyrkas v. Knight, 64 Wash.2d 733, 734, 393 P.2d 943 (1964)). When the holder of an option makes valuable permanent improvements to the property with the intention to give its notice to exercise or extend the option, but then fails to timely give such notice, an equitable period of grace may be appropriate.[6]Wharf, 24 Wash.App. at 611, 605 P.2d 334 (quoting 1 ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 35, at 146-47 (1963)); see also Pardee, 163 Wash.2d at 573, 182 P.3d 967 (holding that an equitable grace period may be appropriate because "the optionee was allowed to occupy the property and make substantial improvements thereon").
¶ 24 In determining that an equitable grace period was appropriate, we articulated five special circumstances in the Wharf decision that, in that case, justified the trial court's decision to grant equitable relief: (1) the failure to give notice was purely inadvertent, (2) an inequitable forfeiture would have resulted without the equitable relief, (3) the failure to give timely notice did not prejudice or change the position of the other party, (4) the lease was for a long term, and (5) there was no undue delay in giving notice, given that the other party had "substantially contributed to cause the delay" by "previously accept[ing] even later exercises of lease options. . . without comment." Wharf, 24 Wash.App. at 612-13, 605 P.2d 334. We did not hold, however, that all five of these circumstances need be present in every case in which an equitable grace period is granted.[7] *10 Indeed, such an inflexible approach would be inconsistent with the trial court's broad discretion to fashion equitable remedies. SAC Downtown Ltd. P'ship v. Kahn, 123 Wash.2d 197, 204, 867 P.2d 605 (1994).
¶ 25 The circumstances of this case similarly justify the trial court's grant to Cornish of an equitable period of grace. Without the trial court's grant of equitable relief, Cornish would forfeit a substantial investment in the property due to a payment made only a few days late. Cornish invested approximately $600,000 to remodel and improve the property. Such extensive improvements are easily adequate to constitute a forfeiture. Indeed, our Supreme Court in Pardee determined that a forfeiture of $20,669 in repairs and 2,500 hours of work on the property constituted a "significant forfeiture." 163 Wash.2d at 576, 182 P.3d 967.
¶ 26 Furthermoreand despite Virginia Limited's conjectures to the contrary[8]the record supports Cornish's contention that it at all times intended to extend the option period and exercise the option to purchase. Cornish not only invested $600,000 in the 1000 Virginia Street property; in 2006, it also applied for (and later received) $425,000 in public grants awarded for the purpose of purchasing the property, $350,000 of which can be used for this purpose only. Furthermore, this particular property is integral to Cornish's "Master Campus Plan" to relocate its campus to the Seattle neighborhood wherein the 1000 Virginia Street property is located. Were it precluded from purchasing the property, Cornish would forfeit a substantial investment. Given that Cornish at all times intended to exercise the option to purchase, and that its payment was only a few days late, such a substantial forfeiture would be inequitable.
¶ 27 Moreover, many of the factors we deemed important in Wharf are also present in this case. First, Cornish's failure to timely extend the option periodby mailing the check three days latewas inadvertent. Wharf, 24 Wash.App. at 612, 605 P.2d 334 (stating that the failure to give notice was inadvertent, as "[i]t was not the result of intentional, culpable or . . . `grossly negligent' conduct"). Cornish's CFO, Riddell, stated in a declaration to the trial court that he intended to give the check to Etherington at a December 28 meeting. He further stated that, when the meeting did not occur, he did not immediately mail the check because the postage meter at the college had already been set ahead to January. He then forgot to mail the check until January 5. Virginia Limited claims that Cornish made the late payment as part of an intentional "scheme," in order to give the appearance of a valid extension payment while not actually legally binding Cornish to purchase the property under the terms of the Agreementthus, enabling Cornish to attempt to "renegotiate" those terms. Virginia Limited failed, however, to provide facts supporting this supposition.
¶ 28 Furthermore, Virginia Limited has not demonstrated any change in position or prejudice as a result of the late option payment. Virginia Limited concedes that "no intervening event occurred" between the due date of the payment and the date it was received. Despite this, it contends that it will suffer "significant adverse consequences" by virtue of the grant of an equitable grace period. However, the only "adverse consequence" identified by Virginia Limited is that it must sell the property for the agreed upon contract price of $3 milliona price that, due to rezoning, may be more than $4 million less than the current value of the property. This "prejudice," however, was not caused by Cornish's untimely extension payment. Virginia Limited failed to identify any prejudice caused by the three-day delay.
¶ 29 Due to the discretionary nature of decisions made in equity, granting equitable relief on summary judgment may be inappropriate in many cases. See Folsom, 135 *11 Wash.2d at 663, 958 P.2d 301 (stating that summary judgment is appropriate only if "a reasonable person could reach only one conclusion"). In this case, however, the evidence strongly supports the trial court's conclusion that Cornish is entitled to an equitable grace period. A response to summary judgment must "set forth specific facts showing that there is a genuine issue for trial." CR 56(e); Grimwood v. Univ. of Puget Sound, Inc., 110 Wash.2d 355, 359, 753 P.2d 517 (1988). Because Virginia Limited failed to set forth such facts, we affirm the trial court's ruling on this question.[9]

IV
¶ 30 Virginia Limited next contends that the trial court erred by awarding to Cornish specific performance of the option to purchase the property at 1000 Virginia Street. We disagree.
¶ 31 Because the trial court has broad discretionary authority to fashion equitable remedies, we review such remedies under the abuse of discretion standard. SAC Downtown Ltd. P'ship, 123 Wash.2d at 204, 867 P.2d 605.[10] An abuse of discretion occurs when the trial court's decision is manifestly unreasonable or is exercised on untenable grounds or for untenable reasons. Gildon v. Simon Prop. Group, Inc., 158 Wash.2d 483, 494, 145 P.3d 1196 (2006).
¶ 32 "When a court's legal powers cannot adequately compensate a party's loss with money damages, then a court may use its broad equitable powers to compel a party to specifically perform its promise." Crafts v. Pitts, 161 Wash.2d 16, 23-24, 162 P.3d 382 (2007) (awarding specific performance of conveyance of real property on summary judgment) (citing RESTATEMENT (SECOND) OF CONTRACTS § 360 (1981)). "When determining whether damages would provide adequate compensation, courts inquire as to (i) the difficulty of proving damages with reasonable certainty, (ii) the difficulty of procuring a suitable substitute, and (iii) the likelihood that an award of damages could not be collected." Crafts, 161 Wash.2d at 24, 162 P.3d 382 (citing RESTATEMENT (SECOND) OF CONTRACTS § 360). Furthermore, because land is unique and difficult to value, specific performance is often the only adequate remedy for a breach of contract regarding real property. Pardee, 163 Wash.2d at 568-69, 182 P.3d 967. Specific performance may be granted "only if a valid contract exists, a party has threatened or is threatening to breach the contract, the terms of the contract are clear, and the contract is not the product of fraud or unfairness." Pardee, 163 Wash.2d at 569, 182 P.3d 967. A lease containing an option to purchase is enforceable by specific performance. Carpenter v. Folkerts, 29 Wash.App. 73, 76, 627 P.2d 559 (1981).
¶ 33 Money damages would be inadequate to compensate Cornish for the property at 1000 Virginia Street. The property is part of Cornish's "Master Campus Plan" to relocate *12 the campus from its Capitol Hill location to downtown Seattle. Pursuant to this plan, Cornish now owns, or holds an option to purchase, nine properties downtown. Vicki Clayton, Cornish's chief operations officer, specified in a declaration the difficulties of finding property in this location, including the "acute shortage of space [in the area]" and "development in the South Lake Union area [that] has priced many potential properties beyond Cornish's reach."
¶ 34 The location of the 1000 Virginia Street property is of particular significance. Because the property is just across an alley from the college's theater, Cornish located its scene shops at 1000 Virginia Street. Clayton explained that "[t]he difficulty of moving lighting, costumes, sets and other delicate and heavy equipment designed and built at the scene shop to the theater renders the immediate proximity of the scene shop to the theater of unique and irreplaceable value to the school." Certainly, procuring a suitable substitute for the property at 1000 Virginia Street would be exceedingly difficult, if not impossible. See Crafts, 161 Wash.2d at 24, 162 P.3d 382.
¶ 35 Furthermore, given Virginia Limited's purported financial condition, an award solely of money damages may be difficult or impossible for Cornish to collect.[11]See Crafts, 161 Wash.2d at 24, 162 P.3d 382 (stating that courts may consider "the likelihood that an award of damages could not be collected" when determining whether money damages would adequately compensate the nonbreaching party (citing RESTATEMENT (SECOND) OF CONTRACTS § 360)).
¶ 36 Virginia Limited contends that Cornish had no right to specific performance because Virginia Limited did not breach or threaten to breach the Agreement. Virginia Limited asserts that, because its obligation to honor Cornish's extension payment was "non-existent until the trial court granted an extra-contractual grace period," it did not breach the parties' agreement by failing to honor Cornish's payment. Virginia Limited is incorrect.
¶ 37 "One of the basic principles of contract law is that the general law in force at the time of the formation of the contract is a part thereof." Arnim v. Shoreline Sch. Dist. No. 412, 23 Wash.App. 150, 153, 594 P.2d 1380 (1979). Indeed, it has long been held to be "the universal law that the statutes and laws governing citizens in a state are presumed to be incorporated in contracts made by such citizens, because the presumption is that the contracting parties know the law." Leiendecker v. Aetna Indem. Co., 52 Wash. 609, 611, 101 P. 219 (1909); accord Fischler v. Nicklin, 51 Wash.2d 518, 522, 319 P.2d 1098 (1958) ("[E]xisting law is a part of every contract, and must be read into it."). This principle applies both to "statutes and the settled law of the land at the time the contract is made." In re Kane, 181 Wash. 407, 410, 43 P.2d 619 (1935). The right of an option holder, under appropriate circumstances, to an equitable period of grace in exercising the option was the "settled law" of Washington long before the Agreement herein was signed by the parties. See, e.g., Heckman Motors, Inc. v. Gunn, 73 Wash.App. 84, 87-88, 867 P.2d 683 (1994) (noting that an equitable grace period is appropriate in some circumstances, though not pursuant to the facts of that case) (quoting 1 ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 35, at 146-47); Wharf, 24 Wash.App. at 611, 605 P.2d 334 (quoting 1 ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 35, at 146-47). Thus, Cornish possessed this right from the outset; it was not "created" by the trial court when it ruled in Cornish's favor. For this reason, Virginia Limited was obligated pursuant to the parties' agreement to extend the option period upon receipt of Cornish's late payment. Not doing so was a breach of the Agreement.
¶ 38 Virginia Limited further contends that the trial court erred by awarding specific performance without balancing the equities between the parties. However, despite this contention, there is insufficient support in the record to demonstrate that compliance with the specific performance order was impossible *13 or caused undue hardship to Virginia Limited. Given the trial court's "broad discretionary power to fashion equitable remedies," SAC Downtown Ltd. P'ship, 123 Wash.2d at 204, 867 P.2d 605, we disagree that the trial court improperly awarded specific performance.
¶ 39 Because it would be exceedingly difficult, if not impossible, for Cornish to procure a suitable substitute for the 1000 Virginia Street property, money damages would undoubtedly be inadequate to compensate Cornish. The trial court acted well within its equitable power to grant specific performance of the option to purchase the property. Thus, we affirm the trial court's order awarding specific performance.

V
¶ 40 Virginia Limited next contends that the trial court erred by dismissing on summary judgment the defendants' counterclaim for tortious interference. Because no genuine issue of material fact precluded the entry of summary judgment on this claim, we disagree.
¶ 41 A claim of tortious interference requires (1) the existence of a valid contractual relationship of which the defendant has knowledge, (2) intentional interference with an improper motive or by improper means that causes breach or termination of the contractual relationship, and (3) resultant damage. Leingang v. Pierce County Med. Bureau, Inc., 131 Wash.2d 133, 157, 930 P.2d 288 (1997). The defendant's improper purpose or use of improper means must "in fact cause injury to the . . . contractual relationship." Leingang, 131 Wash.2d at 157, 930 P.2d 288. Exercising one's legal interests in good faith is not improper interference. Leingang, 131 Wash.2d at 157, 930 P.2d 288 (citing Schmerer v. Darcy, 80 Wash.App. 499, 506, 910 P.2d 498 (1996)).
¶ 42 Virginia Limited failed to provide evidentiary facts sufficient to raise a genuine issue of material factas required to oppose summary judgmentregarding Cornish's motive in meeting with the WSHFC. Rugg, 115 Wash.App. at 224, 61 P.3d 1184 (evidentiary facts include "information as to what took place, an act, an incident, a reality as distinguished from supposition or opinion"). Despite Etherington's testimony as to his "fear" that "some kind of deal is brewing behind the scenes," he failed to point to any evidence in support of this contention. Indeed, he testified that he had no firsthand knowledge of the substance of the meetings between Cornish and the WSHFC.
¶ 43 Instead, the evidence supports Cornish's contention that, in meeting with the WSHFC, it was "motivated exclusively by [its] desire to protect its legal interest in the Property." Riddell testified that Cornish's purpose in meeting with the WSHFC was to attempt to understand the low-income housing restrictions on the propertyrestrictions that could prevent Virginia Limited from conveying clear title as it had contracted to do. The only reasonable inference that can be drawn from the evidence is that Cornish had no improper motive. Rugg, 115 Wash. App. at 229, 61 P.3d 1184 (holding that while all reasonable inferences must be drawn in favor of the nonmoving party on summary judgment, "[u]nreasonable inferences that would contradict those raised by evidence of undisputed accuracy need not be so drawn").
¶ 44 Moreover, there is no evidence suggesting that Cornish's communications with the WSHFC caused injury to Virginia Limited. Virginia Limited posits that the meetings between Cornish and the WSHFC frustrated Virginia Limited's ability to reduce the duration of its low-income housing obligations. The testimony of Tim Sovold, the director of compliance at the WSHFC, directly contradicts this supposition: when asked whether the conversations between Cornish and the WSHFC were grounds for the decision not to reduce the housing obligations, Sovold replied, "No, absolutely not."
¶ 45 Virginia Limited failed to set forth facts sufficient to raise a genuine issue of material fact regarding the elements required to establish a tortious interference claim. Accordingly, we affirm the trial court's dismissal of the counterclaim.

VI
¶ 46 Virginia Limited and Etherington contend that the trial court erred by *14 finding them liable for wrongful eviction on summary judgment. We disagree.
¶ 47 Pursuant to the parties' agreement, either party may terminate the lease upon "substantial destruction" of the premises by giving written notice to the other within 30 days of the casualty.[12] In Etherington's letter giving notice to Cornish of the early terminationsent in April 2008he cites the "deterioration noted by our engineer in late December" as the event triggering termination. Etherington also testified that he sent this letter to Cornish due to safety concerns that arose as a result of the engineer's report in December 2007. A month after this testimony, however, Etherington testified in a deposition that the termination notice was sent due to unsuccessful efforts in March 2008 to remedy stucco falling from the building. This subsequent testimony contradicts his earlier testimony that he viewed the structural deterioration in March as "more of a confirmation" ofrather than different fromthe engineer's December analysis.
¶ 48 Despite Etherington's assertion that "substantial destruction" occurred in March, he has failed to raise a genuine issue of material fact regarding the timeliness of the early termination notice to Cornish. "`When a party has given clear answers to unambiguous [deposition] questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.'" Marshall v. AC & S, Inc., 56 Wash.App. 181, 185, 782 P.2d 1107 (1989) (alteration in original) (quoting Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc., 736 F.2d 656, 657 (11th Cir.1984)). To the extent that Etherington's subsequent declaration contradicts his prior testimony, an issue of material fact does not arise. See Klontz v. Puget Sound Power & Light Co., 90 Wash.App. 186, 192, 951 P.2d 280 (1998). Thus, the only reasonable inference is that "substantial destruction" occurred, if at all,[13] in December 2007and, consequently, that the April 2008 termination notice was untimely pursuant to the parties' agreement.[14]
¶ 49 Because Virginia Limited and Etherington failed to raise a genuine issue of material fact as to whether their early termination of the lease comported with the parties' agreement, we affirm the trial court's wrongful termination judgment.

VII
¶ 50 Virginia Limited next contends that the trial court erred by awarding to Cornish $2.4 million in consequential damages in addition to awarding specific performance *15 of the option to purchase the property. We disagree.
¶ 51 Consequential damages awarded in addition to specific performance are not awarded for breach of the contract. Rather, they are awarded at the equitable discretion of the trial court in an attempt to make the nonbreaching party whole. Rekhi v. Olason, 28 Wash.App. 751, 757, 626 P.2d 513 (1981). We do not disturb an exercise of such discretion absent a clear showing of abuse of discretionthat is, "discretion that is manifestly unreasonable or exercised on untenable grounds." Paris v. Allbaugh, 41 Wash.App. 717, 720, 704 P.2d 660 (1985).
¶ 52 To the extent possible, specific performance should place the parties in the condition that they would have been in had the contract been performed. Chan v. Smider, 31 Wash.App. 730, 736, 644 P.2d 727 (1982). However, specific performance alone can rarely achieve this objective:
"[A] decree for specific performance seldom brings about performance within the time that the contract requires. In this respect such a decree is nearly always a decree for less than exact and complete performance. For the partial breach involved in the delay, money damages will be awarded along with the decree for specific performance."
Rekhi, 28 Wash.App. at 758, 626 P.2d 513 (alteration in original) (quoting Restatement of Contracts, § 365 cmt. d). Thus, consequential damages are permitted because "the contract is being enforced retrospectively, [and] the equities should be adjusted accordingly." Rekhi, 28 Wash.App. at 758, 626 P.2d 513.
¶ 53 Because consequential damages are awarded in addition to specific performance in order to restore the nonbreaching party "as nearly as possible to the position he would have been in had the seller performed," Rekhi, 28 Wash.App. at 757, 626 P.2d 513, such damages must run from the date at which the contract required performance.[15] Thus, the trial court was correct in concluding that consequential damages "begin to flow not from the date the court ordered specific performance, but from the date upon which performance should have occurred had the option been recognized by the owner."
¶ 54 Virginia Limited contends that the money damages awarded are contract damages and, thus, are impermissible in addition to an award of specific performance. However, as explained above, consequential damages are permitted to account for losses incurred when specific performance does not result in performance at the time required by the parties' agreement. Rekhi, 28 Wash. App. at 757-758, 626 P.2d 513. Thus, such money damages are not impermissible contract damages. Furthermore, the fact that $2.4 million is a substantial amount of damages is not itself problematic, if this is the amount necessary to place Cornish in the position that it would have been in had Virginia Limited not breached the Agreement.
¶ 55 The trial court has broad discretion in fashioning equitable relief. SAC Downtown Ltd. P'ship, 123 Wash.2d at 204, 867 P.2d 605. It did not abuse its discretion in awarding to Cornish $2.4 million in consequential *16 damages. Accordingly, we affirm the trial court's decision on this issue.

VIII
¶ 56 Etherington contends that the trial court erred by finding him jointly and severally liable for the full amount of Cornish's attorney fees and costs. He further asserts that the trial court erred by not applying the proportionality rule to determine the award of attorney fees and by not awarding to Etherington attorney fees and costs. We agree that the trial court erred by finding Etherington jointly and severally liable for Cornish's attorney fees, insofar as those fees were incurred for claims on which Cornish prevailed only against Virginia Limited. We further agree that the proportionality rule must be applied to allocate attorney fees between Etherington and Cornish.
¶ 57 An attorney fee award made pursuant to a contract may be reversed only if the trial court manifestly abused its discretion. Noble v. Safe Harbor Family Pres. Trust, 167 Wash.2d 11, 17, 216 P.3d 1007 (2009). Whether a party is a "prevailing party" is a mixed question of law and fact that we review under an error of law standard. Eagle Point Condo. Owners Ass'n v. Coy, 102 Wash.App. 697, 706, 9 P.3d 898 (2000).
¶ 58 Attorney fees and costs may be awarded when authorized by a contract, a statute, or a recognized ground in equity. Kaintz v. PLG, Inc., 147 Wash.App. 782, 785, 197 P.3d 710 (2008). When a contract includes a bilateral attorney fees provision, "it is the terms of the contract to which the trial court should look to determine if such an award is warranted." Kaintz, 147 Wash. App. at 790, 197 P.3d 710. "`Where the terms of a contract are plain and unambiguous, the intention of the parties shall be ascertained from the language employed.'" Marine Enters., Inc. v. Sec. Pac. Trading Corp., 50 Wash.App. 768, 773, 750 P.2d 1290 (1988) (quoting Schauerman v. Haag, 68 Wash.2d 868, 873, 416 P.2d 88 (1996)).
¶ 59 As a general rule, a prevailing party is one who receives an affirmative judgment in its favor. Marassi v. Lau, 71 Wash.App. 912, 915, 859 P.2d 605 (1993), abrogated on other grounds by Wachovia SBA Lending, Inc. v. Kraft, 165 Wash.2d at 481, 200 P.3d 683 (2009). But see Marine Enters., Inc., 50 Wash.App. at 773, 750 P.2d 1290 (holding that when parties provide specific contract language regarding attorney fees, "reliance on cases holding that the prevailing party is the party with an affirmative judgment rendered in his favor . . . is misplaced"). However, a successful defendant can also recover as a prevailing party. Marine Enters., Inc., 50 Wash.App. at 772, 750 P.2d 1290. Such a defendant need not have made a counterclaim for affirmative relief, as the defendant can recover as a prevailing party for successfully defending against the plaintiff's claims. See Marassi, 71 Wash. App. at 916, 859 P.2d 605. In a contract dispute where "several distinct and severable claims" are at issue, the determination of the prevailing party may be subjective and difficult to assess. Marassi, 71 Wash.App. at 917, 859 P.2d 605. In such a case, we apply the proportionality approach, pursuant to which each party is awarded attorney fees for the claims on which it succeeds or against which it successfully defends and the awards are then offset. Marassi, 71 Wash.App. at 918, 859 P.2d 605.[16]
¶ 60 We first evaluate whether the trial court abused its discretion by finding Etherington jointly and severally liable for the full amount of Cornish's attorney fees and costs. Cornish brought two major claims against Virginia Limited and Etheringtonan ownership claim brought pursuant to the option to purchase and an occupancy claim originating in the leasehold provisions of the Agreement. The trial court dismissed Cornish's ownership claim against Etherington, finding that Etherington did not own the property at 1000 Virginia Street and, thus, had no authority *17 to convey it. The trial court subsequently rejected Cornish's request to pierce the corporate veil such that Etherington would be held individually liable for the actions of the partnership. The trial court denied Cornish's motion to reconsider that decision, and Cornish did not appeal from the decision.[17]
¶ 61 Without piercing the corporate veil, the trial court cannot simply disregard the liability implications of the business structures of Virginia Limited and Virginia-Terry, LLC. Thus, the trial court was compelled to evaluate not only which party substantially prevailed, but also against whom that party prevailed. If Virginia Limited and Etherington are not evaluated individually in determining who is the substantially prevailing party, then Etherington would be liable for the full amount of Cornish's attorney fees and costs even if he were not found liable on any of Cornish's claims. This cannot be the correct result, particularly where all of Cornish's claims against Etherington were resolved prior to trial. The trial court abused its discretion in failing to consider Virginia Limited and Etherington separately when determining which party substantially prevailed.
¶ 62 In this case, attorney fees and costs are available to the "substantially prevailing party" pursuant to the parties' agreement.[18] When a contract includes a bilateral fees provision, we generally look to the parties' language to determine which party, if any, is entitled to an award of fees. Kaintz, 147 Wash.App. at 790, 197 P.3d 710. However, when "several distinct and severable claims" are at issue, as in this case, we apply the proportionality approach in our award determination. Marassi, 71 Wash.App. at 917, 859 P.2d 605 (applying the proportionality approach where the parties' contract provided for attorney fees and costs to the "successful party").
¶ 63 Cornish brought two major claims against both Virginia Limited and Etheringtonan ownership claim and an occupancy claim. Virginia Limited and Etherington brought three counterclaims against Cornish, all of which the trial court dismissed. As between Etherington and Cornish, Cornish prevailed on its occupancy claim and successfully defended against the three counterclaims. However, the trial court dismissed Cornish's ownership claim as to Etherington; thus, Etherington successfully defended against this claim. Pursuant to the proportionality approach, each party is awarded attorney fees for those claims upon which it prevails or against which it successfully defends, and the awards are then offset. Marassi, 71 Wash.App. at 918, 859 P.2d 605. Cornish will be awarded the fees incurred for its occupancy claim and those incurred defending against the defendants' counterclaims. Etherington will be awarded the fees he incurred defending against Cornish's ownership claim.
¶ 64 Pursuant to Washington's lodestar method of determining attorney fees, "the party seeking fees bears the burden of proving the reasonableness of the fees." Mahler v. Szucs, 135 Wash.2d 398, 433-34, 957 P.2d 632, 966 P.2d 305 (1998). Because any hours pertaining to unsuccessful theories or claims must be excluded, Mahler, 135 Wash.2d at 434, 957 P.2d 632, both Cornish and Etherington will have the burden of demonstrating which fees were incurred for their respective successful claims. Cornish will also have the burden of showing which fees were incurred as to each of the other parties, given that Etherington cannot be held liable for the attorney fees and costs incurred by Cornish for claims on which it prevailed only against Virginia Limited.
*18 ¶ 65 We reverse and remand the trial court's award of attorney fees and costs as between Etherington and Cornish. On remand, the trial court should apply the proportionality rule to determine the appropriate award of attorney fees and costs as between these parties.

IX
¶ 66 Virginia Limited contends that the trial court erred by not applying the proportionality rule to determine attorney fees and costs. It further contends that the trial court erred by awarding to Cornish the attorney fees and costs it incurred litigating against Virginia Limited's bankruptcy petition. We disagree.
¶ 67 Cornish is clearly the "substantially prevailing party" with regard to Virginia Limited. Cornish prevailed against Virginia Limited on both its ownership claim and its occupancy claim. Moreover, Cornish successfully defended against the defendants' three counterclaims, all of which were dismissed by the trial court. We need not apply the proportionality approach to determine attorney fees and costs as between Cornish and Virginia Limited, given that Cornish is the prevailing party on all such claims. Because Cornish is the substantially prevailing party on all claims as to Virginia Limited, we affirm the trial court's award of attorney fees and costs as between these two parties.[19]
¶ 68 Nor did the trial court err by awarding to Cornish attorney fees and costs incurred litigating against Virginia Limited's bankruptcy petition. In Washington, "an action is on a contract for purposes of a contractual attorney fees provision if the action arose out of the contract and if the contract is central to the dispute." Tradewell Group, Inc. v. Mavis, 71 Wash.App. 120, 130, 857 P.2d 1053 (1993). Virginia Limited petitioned for removal of this case to bankruptcy court, where it attempted to reject the option to purchase in the Agreement. The bankruptcy court denied Virginia Limited's motion to reject the option agreement and dismissed the bankruptcy petition. The bankruptcy court stated its view that the petition "was a litigation tactic rather than a bona fide effort to reorganize." Because Cornish's involvement in the bankruptcy proceedings was initiated to protect its contractual rights pursuant to the Agreement, the trial court properly awarded to Cornish attorney fees and costs incurred in connection with Virginia Limited's bankruptcy filing.[20]
¶ 69 We affirm the trial court's award of attorney fees and costs as between Virginia Limited and Cornish.

X
¶ 70 All parties request attorney fees and costs associated with this appeal. Contractual authority as a basis for an award of attorney fees at trial also supports such an award on appeal. RAP 18.1. Furthermore, the Agreement explicitly provides for attorney fees and costs on appeal to the "substantially prevailing party."
¶ 71 On appeal, Cornish has prevailed on all of its substantive claims against both Virginia Limited and Etherington. As between Virginia Limited and Cornish, we award attorney fees and costs on appeal to Cornish. However, because we reverse the trial court's award to Cornish of attorney fees and *19 costs as to Etherington, Etherington has prevailed on that issue. Thus, pursuant to the proportionality approach, we award to Etherington and Cornish attorney fees and costs on appeal for those claims upon which each has prevailed. Upon proper application by the parties, a commissioner of this court will enter the necessary order.
¶ 72 Affirmed in part. Reversed in part and remanded.
We concur: SPEARMAN and BECKER, JJ.
NOTES
[1] There is some confusion in the record on appeal as to the exact business structure of these entities. It is clear that 1000 Virginia Limited is a limited partnership, but Virginia-Terry, LLC is at times referred to as a limited partnership, rather than a limited liability company. However, the parties and the trial court proceeded as if Virginia-Terry is an LLC, with the protections from individual liability that such a business structure provides.
[2] The Agreement established a closing date of July 1, 2008.
[3] Years prior to the parties' agreement, Virginia Limited constructed four stories of wood-frame housing on top of what was then a two-story concrete structure. Construction defects led to water intrusion that compromised the structure of the building. Virginia Limited brought a lawsuit against third party contractors to recover for the building defects. Virginia Limited settled the lawsuit, receiving $2.5 million.
[4] The bankruptcy court opined that "the primary reason for this motion to reject [the parties' agreement] is that the sale price under the lease option is $3 million, while the property may have a current value well in excess of $7 million dollars. In short, 1000 Virginia wants to take advantage of the appreciation."
[5] Virginia Limited also contends that Cornish is not entitled to equitable relief because, Virginia Limited asserts, Cornish did not act with vigilance. Specifically, Virginia Limited asserts that Cornish was not vigilant because its extension paymentin addition to being latewas defective, as it contained only one signature and was uncertified. However, once Etherington returned the check to Cornish, "advising Cornish that the check was late," Cornish had no reason to believe that, should it cure such defects, Virginia Limited would then accept the late payment.
[6] Virginia Limited questions the applicability of this case law, arguing that there are no cases in which a "mere" right to extend an optionas is the case herewas at issue. However, whether the exercise of an option or the "mere" extension of an option is at issue is irrelevant, as both may result in inequitable forfeiturewhich is precisely the outcome that the rule providing for an equitable grace period is intended to prevent.
[7] Virginia Limited assigns error to the trial court's finding that Virginia Limited was at fault for causing the delay in Cornish's option extension payment. Because an equitable grace period may be granted in cases in which not all of the Wharf circumstances are present, we need not determine Virginia Limited's responsibility for this delay.
[8] Virginia Limited, relying almost exclusively on minutes from Cornish board meetings in which Cornish's financial situation is discussed, contends that Cornish never intended to exercise the option. Again, Virginia Limited attempts to raise an issue of material fact by offering conjecture rather than "facts evidentiary in nature." Rugg, 115 Wash.App. at 224, 61 P.3d 1184.
[9] Virginia Limited and Etherington also appealed from the trial court's order denying the defendants' motion for partial summary judgment and its order denying the defendants' motion for summary judgment. These motions dealt primarily with the same issues as did Cornish's motion for summary judgment regarding the late option payment; thus, in holding that the trial court correctly granted Cornish's motion, we also hold that the trial court did not err by denying the defendants' motions. The defendants also argued, however, that Cornish should not be permitted to extend the option because it was in default of the leasean issue not explicitly determined in the grant of summary judgment to Cornish. However, any default that may have occurred was waived by the defendants' failure to act earlier to enforce their rights. See Port of Walla Walla v. Sun-Glo Producers, Inc., 8 Wash. App. 51, 54-56, 504 P.2d 324 (1972).
[10] In reviewing a recent case decided on summary judgment, our Supreme Court stated that "a decree of specific performance rests within the sound discretion of the trial court," Crafts v. Pitts, 161 Wash.2d 16, 29, 162 P.3d 382 (2007), and reviewed the trial court's decision to grant specific performance for an abuse of that discretion. Crafts, 161 Wash.2d at 30, 162 P.3d 382. The court did not explain how this approach was consistent with its earlier pronouncement in Folsom that the "de novo standard of review is used by an appellate court when reviewing all trial court rulings made in conjunction with a summary judgment motion." 135 Wash.2d at 663, 958 P.2d 301. Because the Crafts decision is more recent than Folsom and, unlike Folsom, deals with a dispute precisely of the type presented here, we follow the court's method of analysis set forth in Crafts.
[11] Etherington contends that Virginia Limited's bankruptcy petition was brought due to a shortage of operating funds.
[12] Again, the pertinent provision provides:

Substantial Destruction. If the damage to the Leased Premises is so substantial that repair of such damage will require more than 180 days to complete (or will require more than 90 days to complete if such casualty occurs after January 1, 2008), then either Etherington or Lessee may elect, by written notice given to the other not later than thirty (30) days after the date of such casualty, to terminate this Lease effective as of the date of such casualty.
[13] The record suggests that "substantial destruction" may not have occurred at all. However, we need not determine whether an issue of material fact exists as to the occurrence of "substantial destruction." Whether or not a triggering event occurred, Virginia Limited and Etherington violated the lease, either by terminating without the triggering event of "substantial destruction" or by untimely terminating more than 30 days after that event.
[14] Virginia Limited and Etherington further contend that they are not liable for wrongful eviction because: (1) the deteriorating condition of the building was caused by third parties, (2) Cornish assumed the risk of early termination because it knew of the defects, and (3) Cornish waived any claim for wrongful eviction by remaining in the premises for months after the termination notice.

Whether the appellants caused the defects is irrelevant to the wrongful eviction claim. Cornish claims that the defendants are liable not for causing the so-called "substantial destruction," but for failing to act in accord with the parties' agreement. Similarly, Cornish's knowledge of the defectswhich Cornish admitsis of no consequence for its claim. Finally, because Cornish was not constructively evicted, but was instead actually evicted, Cornish did not waive its claim by remaining on the property.
Etherington also assigns error to the trial court's finding that Etherington was the general contractor for construction of the low-income housing. Because we do not rely on this finding in our holding that Cornish was wrongfully evicted, we do not reach this issue.
[15] If, as Virginia Limited contends, the "delay" for which consequential damages compensates is the period between the decree of specific performance and the actual performance, the nonbreaching party would not be made whole pursuant to the terms of the parties' agreement. Virginia Limited relies on the court's holding in Rekhi in support of its contention that consequential damages should run from the date of the specific performance decree. In that case, the trial court granted specific performance to the purchasers of property when the vendor failed to convey the property; however, the trial court denied the purchasers' request for consequential damages, despite finding that they suffered loss due to delays associated with the breach. Rekhi, 28 Wash.App. at 752-53, 626 P.2d 513. The appellate court remanded, instructing the trial court to award the consequential damages and any additional consequential damages resulting from the delay caused by the appeal. Rekhi, 28 Wash.App. at 758, 626 P.2d 513. Because the damages at issue were sought at the trial where specific performance was awarded, they could not have compensated for the delay subsequent to the decree, as that delay would not yet have occurred. Virginia Limited's interpretation of Rekhi is not only incorrect, it would also fall short of making whole the nonbreaching party, which is the purpose for which consequential damages are awarded.
[16] We are familiar with Washington authority holding that "where both parties prevail on major issues, neither is entitled to attorney fees." Sardam v. Morford, 51 Wash.App. 908, 911, 756 P.2d 174 (1988). However, in extensive briefing, neither party cited this authority. When questioned at oral argument regarding this rule, both parties suggested that it was not the appropriate resolution in this case.
[17] At oral argument, Cornish asserted that Etherington should be liable for the full amount of Cornish's attorney fees and costs pursuant to a theory that the obligors are presumed to be co-promisors and to be jointly liable. We decline to address this issue, as it was raised for the first time at oral argument. RAP 12.1(a); Apostolis v. City of Seattle, 101 Wash.App. 300, 306, 3 P.3d 198 (2000).
[18] Again, the attorney fees provision in the Agreement provides:

In the event that Cornish College, Etherington, or Virginia Limited shall commence proceedings or institute action to enforce any rights hereunder . . . the substantially prevailing party shall be entitled to costs and reasonable attorney's fees, including those for appeal.
[19] Virginia Limited also contends that Cornish is not entitled to attorney fees and costs because the contract provides for such an award only to enforce rights under the Agreement, and Cornish's action, Virginia Limited argues, was brought in order to excuse it from the requirements of the contract. However, the trial court's grant to Cornish of an equitable grace period established Cornish's right to extend and exercise the option. Thus, Cornish had a right to receive contractual performance from Virginia Limited and brought the action on the contract in order to enforce that right.

Similarly, Virginia Limited's contention that the trial court erred by not entering adequate findings is without merit. The trial court entered detailed findings and conclusions regarding its award of attorney fees, thus providing an adequate record upon which we can review the award. See Mahler, 135 Wash.2d at 435, 957 P.2d 632.
[20] For the reasons explained herein, Etherington is correct that the trial court erred in holding him individually liable for Cornish's attorney fees and costs incurred litigating against Virginia Limited's bankruptcy petition.