# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

MUKILTEO RETIREMENT
APARTMENTS, L.L.C., a Washington
limited liability company,

    Respondent,

v.

MUKILTEO INVESTORS L.P., a
Washington limited partnership;
CAMPBELL HOMES CONSTRUCTION,
INC., a Washington corporation,

    Appellant.

DIVISION ONE

No. 69039-6-I

PUBLISHED IN PART OPINION

FILED: August 19, 2013

DWYER, J. — Rule of Appellate Procedure (RAP) 2.5(a)(2) permits an appellant to claim as error, for the first time on appeal, the "failure to establish facts upon which relief can be granted." While functioning as an exception to the general rule that we do not consider new theories and arguments on appeal, the rule's applicability is limited to circumstances wherein the proof of particular facts at trial is required to sustain a claim. Where "relief can be granted" in the absence of such proof, RAP 2.5(a)(2) does not operate to permit a claimant to

argue for the first time on appeal that particular facts were not established at trial.

In this case, Mukilteo Retirement Apartments LLC (MRA) filed a lawsuit for the specific performance of an option agreement that granted MRA the right to purchase a retirement facility from Mukilteo Investors Limited Partnership (MILP). In turn, MILP counterclaimed against MRA, contending that MRA had breached the option agreement by declining to accept MILP's proposed purchase price. Following a bench trial, the trial court determined that MILP had breached the option agreement. The court thereafter entered a decree of specific performance requiring MILP to sell the facility to MRA.

On appeal, MILP contends, for the first time in over three years of litigation, that the option agreement was unenforceable because the parties failed to reach mutual assent regarding a method for determining the facility's purchase price. The issue of the contract's enforceability, however, was neither raised within the pleadings of the parties nor litigated at trial by either implied or express consent. Accordingly, MRA was not required to introduce any evidence in order to prove the existence of an enforceable contract. Because, in such circumstances, RAP 2.5(a)(2) does not permit an appellant to raise the question of a contract's enforceability for the first time on appeal, MILP has failed to demonstrate an entitlement to appellate review of this issue. MILP's additional contentions are also without merit and, accordingly, we affirm the trial court in all respects.

I

In 1997, Ron Struthers and Duane Clark purchased undeveloped real

property in the Harbor Pointe area of Mukilteo. They formed Mukilteo Retirement Apartments LLC for the purpose of developing the property into an independent living and assisted living facility for seniors. Over the course of the following year, Struthers and Clark secured the permits and obtained architectural plans necessary to construct the facility.

In the spring of 1999, Struthers and Clark realized they had insufficient funds to complete construction of the facility. Accordingly, they contacted Carl Campbell, whose construction company, Campbell Homes Construction Inc., was a leading builder of similar facilities in the Northwest. They discussed an arrangement in which Campbell Homes would purchase the property, build the facility, and then lease it back to MRA. Struthers and Clark told Campbell that such an agreement must also include an option for MRA to purchase the facility at a future date.

Mukilteo Investors Limited Partnership was formed as the legal entity to purchase, construct, and lease the facility back to MRA.[1] On October 21, 1999, following extensive negotiations, MILP agreed to purchase the property and construct the facility. MRA signed a 20-year lease to staff and operate the facility, including responsibility for all upkeep and maintenance. The lease provided for annual increases in monthly rent beginning in the fifth year of

---

[1] Ownership of MILP initially consisted of Campbell Homes (2 percent), Kris Campbell (49 percent) and HD Retirement Investors, LLC (49 percent). Campbell Homes was designated as the general partner of MILP. Kris Campbell, the grandson of Carl Campbell, also served as the vice president of Campbell Homes.

occupancy.[2] Although MRA believed that these monthly rental payments exceeded market rents, it agreed to the lease terms in order to secure a contractual right to purchase the facility from MILP.

Accordingly, the parties entered into an option agreement, giving MRA the right to purchase the facility after eight years. The "facility" was defined as the real property, as improved, together with certain personal property. The parties agreed that the purchase price would reflect the highest of three pricing methods: (1) the "fair market value" of the facility on the date the option was exercised, (2) the "replacement cost" of the facility, or (3) the "prospective fair market value" set forth in an attached exhibit (Schedule D), reflecting a base price with annual increases of 3 percent.[3]

The agreement specified that following MRA's exercise of the option, MILP and MRA would have 15 days to reach agreement regarding the "fair market value" of the facility. If no agreement could be reached within that time period, each party would then have five additional days to appoint a disinterested appraiser. Each appraiser would then have 30 days to appraise the facility's fair market value. In the event that only one appraiser was appointed or only one appraiser completed the appraisal within the 30-day period, that appraiser's determination of fair market value would be "final and binding upon the parties."

By contrast, "replacement cost" was to be determined by an appraiser of

---

[2] Keith Therrien, Campbell Homes' long-time attorney, drafted the agreements. MRA also engaged an attorney, Ed Beeksma, to provide it with legal advice during the negotiations.

[3] The parties and the trial court refer to the attached exhibit as Schedule D. This convention is also adopted herein.

- 4 -

MILP's choosing. MILP's selection of such an appraiser was to occur "pursuant to" the same paragraph setting forth the procedure for appointing an appraiser to determine "fair market value." Replacement cost was to be "included in the appraiser's appraisal report on the Facility."

The option agreement stipulated that MRA must exercise its option to purchase the facility during the period beginning on the "eighth (8th) anniversary of the commencement date of the Facility Lease Agreement" and ending on the "first day of the twelfth (12th) month" following that anniversary. The facility lease agreement stipulated that the lease term would commence upon the earlier of (1) "the issuance of a certificate of occupancy" or (2) MRA taking possession for the purpose of installing trade fixtures, personal property, and equipment for use in the operation of the facility.

MILP thereafter secured a loan and began construction. Following the completion of the facility, MRA took possession on or around June 1, 2000. A certificate of occupancy was issued by Snohomish County on June 15, 2000.

MRA hoped to exercise its option to purchase the facility as soon as possible. MRA believed that the commencement date for exercising the option was October 21, 2007—eight years from the date of execution of the lease agreement. Accordingly, on November 14, 2007, MRA sent notice to MILP that it was exercising its option to purchase the facility. MRA noted its willingness to negotiate a closing date but emphasized that time was of the essence. When MILP did not respond, MRA sent a second letter on December 9, 2007, asking MILP to confirm a purchase price of $16,024,643, the 2008 purchase price set

forth by Schedule D. MRA explained that it was in the process of securing financing.

MILP replied by letter on December 28, 2007. The letter explained MILP's position that the earliest the option could be exercised was June 15, 2008, eight years after the date upon which the certificate of occupancy was issued. MILP invited MRA to send another notice at that time.

Nevertheless, on January 3, 2008, MILP retained an appraiser, James A. Brown and Associates, to provide an "analysis of the facility lease agreement and option agreement to determine the proper method of determining the option purchase price under the option agreement for the assets subject thereto." MRA was not informed that James Brown had been retained; nor was MRA provided a copy of the report. Indeed, James Brown neither maintained a working file nor prepared a written report detailing its conclusions with respect to this project.

On February 21, 2008, MRA sent a draft purchase and sale agreement to MILP, inviting further negotiation or revision "regarding closing dates, etc."[4] MILP responded to this letter on March 14, 2008, again rejecting MRA's attempt to exercise the option as premature.[5]

During this period, the ownership of MILP was being substantially restructured. Kris Campbell and Campbell Homes were divested of their

---

[4] The suggested purchase price contained in this document, $15,557,906, reflects the purchase price of the facility set forth in Schedule D for 2007.

[5] MRA and MILP were unable to reach agreement regarding the date that MRA could properly exercise its option. On November 30, 2010, the trial court determined that the option period began on June 15, 2008, eight years from the date upon which the certificate of occupancy was issued.

interests in MILP, and Cimco Properties, a wholly-owned entity of Thomas Dye, became the new general partner. Keith Therrien and Les Powers, Campbell Homes' long-time attorneys, also obtained substantial ownership interests in MILP.

Struthers and Clark met with Dye several times during the spring and summer of 2008. They repeatedly noted MRA's desire to purchase the facility. Nevertheless, although Dye stated that he wished to be accommodating and acknowledged MRA's concerns over price, financing, and a closing date, he did not offer to sell the facility. Instead, Dye presented a proposal whereby MRA could obtain a 20 percent ownership interest in the facility.[6] Struthers and Clark, however, had no interest in this arrangement.

On June 20, 2008, Dye persuaded Struthers and Clark to meet with him again. Once again, there was no offer from MILP to sell the facility outright to MRA. However, in this proposal, which assumed the facility's fair market value to be $16.75 million, MILP offered to convey a larger ownership interest to MRA. More importantly to Struthers and Clark, the proposal gave MRA the right to purchase the entire facility through a second option agreement. After further negotiations, Struthers and Clark agreed to purchase a 40 percent interest in the Harbor Pointe facility with an option to purchase the remaining 60 percent at the end of another ten years.

For the next month and a half, Struthers and Clark heard nothing from MILP regarding the status of this new agreement. Finally, on August 4, 2008,

---

[6] This proposal noted that the facility's "assumed" fair market value was $18.24 million.

Dye sent another proposal. This offer, however, differed substantially from the previously agreed upon arrangement. Although the new proposal still included the opportunity for MRA to acquire a 40 percent ownership interest in the facility, it no longer included an option for MRA to purchase the remaining 60 percent of the facility after ten years.

On August 28, 2008, MRA filed suit for specific performance, monetary damages, and declaratory relief.

On September 17, 2008, MILP again engaged James Brown to perform a fair market and replacement cost analysis of the facility. On October 10, appraiser Aaron Brown, who was assigned to perform the analysis, sent a draft report to MILP. Therrien reviewed the report and made a series of changes. Most significantly, Therrien deleted Brown's inclusion of depreciation as a factor for determining replacement cost, writing into the report that the option agreement contemplated the replacement cost of an undepreciated facility. This modification was later estimated to increase James Brown's valuation of the facility by approximately $3 million. James Brown ultimately accepted all of Therrien's changes.

James Brown issued its final report on November 7, 2008, more than 30 days after MILP had engaged its services. Nevertheless, its transmittal letter was backdated to October 10, 2008. In its report, James Brown opined that the facility's fair market value was $24 million and that its undepreciated replacement cost was $27 million.

On November 10, 2008, MILP offered to sell the facility to MRA for $27

million, the facility's replacement cost as determined by James Brown. MILP stated that this figure was "not subject to challenge."

Both parties moved for summary judgment in March 2012. MRA sought a determination that MILP had breached the option agreement by refusing to sell the property except at the "replacement cost" determined by James Brown. MILP, in turn, sought a determination that the option had been exercised by MRA, and requested that the purchase price be set at $27 million. The trial court denied both motions.

A bench trial commenced in May 2012 and, after four weeks of testimony, the trial court found in favor of MRA. MILP, the court determined, had breached the implied covenant of good faith and fair dealing by deliberately attempting to prevent MRA from purchasing the facility. The court further ruled that MILP had breached the option agreement and that MRA was entitled to specific performance and consequential damages. The trial court set the purchase price of the facility at $18.725 million, which represented the midpoint between MRA's appraisers' determinations of fair market value as of June 15, 2008. MRA was allotted nine months from July 15, 2012 to close the transaction.[7] As consequential damages, the court awarded to MRA the amount of its rental payments to MILP during the period of June 15, 2008 to July 15, 2012.

MILP appeals.

---

[7] The trial court ruled that MRA was obligated to continue to make lease payments from July 15, 2012 until the date of closing. The court noted that it would "retain jurisdiction to extend the closing if circumstances warrant and upon such terms as may be warranted."

II

MILP first contends that the trial court erred by enforcing the option agreement after determining that there was no meeting of the minds with respect to determining "replacement cost," one of three valuation methods contemplated by the agreement for determining the purchase price of the facility. MILP asserts that, although it admitted in its answer that the option agreement was a valid and binding contract, RAP 2.5(a)(2)—which permits an appellant to raise, for the first time on appeal, the "failure to establish facts upon which relief can be granted"— entitles MILP to appellate review of this issue. However, in promulgating RAP 2.5(a)(2), our Supreme Court did not intend to render the civil rules of pleading nullities. Where one party has expressly informed the other that it will not defend on a particular basis (and trial thereafter proceeds as though the issue has been definitively resolved), RAP 2.5(a)(2) does not function to permit an appellant to raise the issue for the first time on appeal. Moreover, even had MILP properly raised the issue of the contract's validity at trial, because the option agreement included all the essential terms of a valid contract, the trial court did not err by enforcing it. We discuss each of these determinations in turn.

A

Our Supreme Court has inherent authority to adopt procedural rules necessary to the operation of the courts. State v. Edwards, 94 Wn.2d 208, 212, 616 P.2d 620 (1980). "As all court rules emanate from one source, it is reasonable to conclude that when the Supreme Court promulgates a rule, it is aware of all other rules and thus can avoid adopting contradictory rules."

Hedlund v. Vitale, 110 Wn. App. 183, 188, 39 P.3d 358 (2002). Accordingly, in interpreting the various court rules of our state, we presume that the Supreme Court intended that such rules apply harmoniously.

It is, of course, among the most fundamental rules of pleading that a defendant's answer must "state in short and plain terms his [or her] defenses to each claim asserted and [to] admit or deny the averments upon which the adverse party relies." Civil Rule (CR) 8(b). If the defendant intends to deny only a part of an averment, "he [or she] shall specify so much of it as is true and material and shall deny only the remainder." CR 8(b). "The theory of Rule 8 is that a defendant's pleading should apprise the plaintiff of the allegations in the complaint that stand admitted and will not be in issue at trial and those that are contested and will require proof to be established to enable plaintiff to prevail." Yarnell v. Roberts, 66 F.R.D. 417, 423 (E.D. Pa. 1975). As the courts of our state have long held, "'[t]he purpose of an answer is to formulate issues by means of defenses addressed to the allegations of the complaint.'" Shinn Irrigation Equip., Inc. v. Marchand, 1 Wn. App. 428, 432, 462 P.2d 571 (1969) (quoting Lopez v. United States Fid. & Guar. Co., 18 F.R.D. 59, 61 (D. Alaska 1955)).

Here, in its complaint, MRA alleged that "[t]he Option Agreement that contains all material terms of the parties' obligations is a valid and binding contract for plaintiff's option to purchase the real property." In its answer, MILP agreed. MILP responded that it "admits the option agreement was a valid and binding contract as between the parties." Indeed, in reliance upon the existence

- 11 -

of a valid option contract, MILP brought its own counterclaim, alleging that MRA had breached the agreement by failing to pay the $27 million "replacement cost" determined by its appraiser.

MILP's answer informed MRA that the enforceability of the contract would not be an issue at trial and that MRA need not offer any evidence to prove a valid and binding contract containing the essential terms of the parties' bargain. Rather, the issues to be litigated were limited to determining which party had breached the agreement and what damages resulted therefrom. Although this would require a determination of the meaning of the parties' contractual agreement, the contract's enforceability was not an issue raised within the pleadings.

The civil rules of our state provide a specific mechanism for circumstances where issues outside the pleadings arise at trial.[8] CR 15(b) provides that "[w]hen

---

[8] MILP contends that, because MRA introduced evidence tending to disprove that the parties manifested mutual assent to an essential term of the option contract, it is not bound by its "judicial admission" that the contract was valid and binding. It asserts that it is well established that a plaintiff waives reliance on a defendant's judicial admission where the plaintiff introduces evidence that tends to disprove his or her own case.

However, no court in our state has adopted such a rule. Indeed, as Justice Madsen has noted, judicial admissions within a defendant's answer "have been defined as 'stipulations by a party or its counsel that have the effect of withdrawing a fact from issue and *dispensing wholly with the need for proof of the fact*.'" Key Design, Inc. v. Moser, 138 Wn.2d 875, 893, 983 P.2d 653, 993 P.2d 900 (1999) (Madsen, J., concurring in part and dissenting in part) (quoting 2 McCormick on Evidence: The Hearsay Rule and Its Exceptions § 254, at 142 (John W. Strong ed., 4th ed.1992)). Such admissions are "'proof possessing the highest possible probative value. Indeed, facts judicially admitted are facts established not only beyond the need of evidence to prove them, *but beyond the power of evidence to controvert them*.'" Best Canvas Prods. & Supplies, Inc. v. Ploof Truck Lines, Inc., 713 F.2d 618, 621 (11th Cir.1983) (emphasis added) (quoting Hill v. Fed. Trade Comm'n, 124 F.2d 104, 106 (5th Cir.1941)). Thus, it is not true, as MILP would have it, that all courts have considered a defendant's judicial admissions so easily waived.

More importantly, MILP's agreement that the option contract was a "binding and valid" contract was more than a judicial admission as to a particular fact. Instead, as discussed above, MILP's answer to MRA's averment formulated the issues that would be litigated at trial. Through

issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." "At the discretion of the trial court, the pleadings may be amended to conform to the evidence at any stage in the action, including at the conclusion of a trial, and even after judgment." Green v. Hooper, 149 Wn. App. 627, 636, 205 P.3d 134 (2009). "'However, amendment under CR 15(b) cannot be allowed if actual notice of the unpleaded issue is not given, if there is no adequate opportunity to cure surprise that might result from the change in the pleadings, or if the issues have not in fact been litigated with the consent of the parties.'"[9] Green, 149 Wn. App. at 636 (quoting Harding v. Will, 81 Wn.2d 132, 137, 500 P.2d 91 (1972)). In determining whether the parties impliedly consented to the trial of an issue, "an appellate court will consider the record as a whole, including whether the issue was mentioned before the trial and in opening arguments, the evidence on the issue admitted at the trial, and the legal and factual support for the trial court's conclusions regarding the issue." Dewey v. Tacoma Sch. Dist. No. 10, 95 Wn. App. 18, 26, 974 P.2d 847 (1999.)

Here, neither MRA nor MILP expressly or impliedly consented to try the issue of the option contract's enforceability. Indeed, throughout the litigation, both parties asserted that the contract should be enforced—MRA contending that

---

this pleading, MILP expressly informed MRA that it would not defend MRA's breach of contract action on the basis that the option contract was unenforceable. Indeed, MILP itself relied upon the validity of the contract in bringing its counterclaim against MRA for breach of contract. Where an issue is not raised in the pleadings, as was the case here, CR 15(b) provides the exclusive means for determining whether resolution of that issue constitutes the proper basis for a judgment.

[9] Where issues outside the pleadings have in fact been litigated, the mere failure to amend the pleadings does not affect the result of the trial of these issues. CR 15(b).

MILP had breached the option agreement "by rejecting [MRA's] attempts to exercise its option," and MILP asserting that "it [was] MRA who has breached the option agreement by failing to purchase the property for the required option price on time, as required by the option agreement." No challenge to the enforceability of the contract was noted in the various motions of the parties, their trial briefs, or during opening argument. Although the parties disagreed at trial regarding the meaning of the term "replacement cost," neither party argued that this disagreement rendered the contract unenforceable. See 25 DAVID K. DEWOLF ET AL., WASHINGTON PRACTICE: CONTRACT LAW AND PRACTICE § 2.8, at 43 (2d ed. 2007) ("Mutual assent does not . . . require both parties to have an actual and identical understanding of all of the nuances of the bargain."). MILP, MRA, and the trial court—which entered no conclusion of law regarding the contract's validity and instead simply enforced it—all treated the question of the contract's enforceability as affirmatively established.

Indeed, if the issue of the contract's enforceability had been litigated, a host of additional questions would necessarily have arisen. MRA, for instance, asserts that it agreed to pay above-market rents to MILP in order to secure a contractual right to purchase the facility from MILP at a later date. Thus, MRA contends, the option agreement was a material part of the consideration for the lease agreement. If true, then a determination that the option agreement was invalid would raise the issue of whether the lease agreement failed for lack of consideration. At minimum, it would require the trial court to determine if the rents were in fact above-market, the amount of the overcharge, and the extent to

which MILP would be required to disgorge past rent payments in order to avoid unjust enrichment. As noted above, none of these questions emerged during the trial.

Nevertheless, although the issue of the option contract's enforceability made no appearance at any stage of the litigation, MILP asserts that this matter may be raised for the first time on appeal pursuant to RAP 2.5(a)(2). In general, we will not review an issue, theory, argument, or claim of error not presented at the trial court level. Pellino v. Brink's, Inc., 164 Wn. App. 668, 685 n.8, 267 P.3d 383 (2011). RAP 2.5(a)(2), however, provides a limited exception to the general rule, permitting a party to claim as error for the first time on appeal the "failure to establish facts upon which relief can be granted." MILP asserts its claim falls within this exception.[10]

As noted above, the Supreme Court promulgates the procedural rules of our courts with the intent that such rules will apply harmoniously. See Hedlund, 110 Wn. App. at 188-89. At oral argument, MILP's counsel indicated his belief that the requirements of CR 8(b) and CR 15(b) are meaningless where a party seeks to raise as error the failure to prove essential facts pursuant to RAP 2.5(a)(2). We disagree, however, that in promulgating RAP 2.5(a)(2), our Supreme Court intended to render nullities these basic rules of pleading. Indeed,

---

[10] We note that we have previously refused to review the question of a contract's enforceability where the issue was raised for the first time on appeal. Neiffer v. Flaming, 17 Wn. App. 443, 446, 563 P.2d 1300 (1977). As MILP does here, in Neiffer, the appellant contended that an option provision in a lease did not contain sufficient terms and conditions necessary for the sale of the property and that, accordingly, the option was unenforceable. 17 Wn. App. at 446. Because this issue was raised for the first time on appeal, however, we determined that we would not consider the appellant's contention. Neiffer, 17 Wn. App. at 446.

by its own language, RAP 2.5(a)(2) pertains only to issues that must be established by proof of particular facts at trial. Where no proof of such facts is required in order to obtain relief, the rule is simply inapplicable. If "relief can be granted" despite the absence of particular facts, an appellant cannot thereafter invoke RAP 2.5(a)(2) in order to argue for the first time on appeal that such facts were not established.

Here, having indicated in its answer that the option contract's enforceability was not a contested issue in the case, MILP cannot be heard to complain on appeal that the facts necessary to demonstrate a valid contract were not established at trial. Given the pleadings, the various motions of the parties, and the way the case was actually tried, no proof of "mutual assent" was necessary for MRA to obtain relief on its breach of contract claim. See Yarnell, 66 F.R.D. at 423. The question of the contract's validity had been definitively resolved, and no proof of facts demonstrating its enforceability was necessary. Accordingly, RAP 2.5(a)(2) is inapplicable and, thus, MILP has not demonstrated an entitlement to appellate review.

B

Even had MILP denied the validity of the option agreement in its answer, given the language of the contract, we perceive no error in the trial court's decision to enforce it. MILP contends that the parties failed to reach mutual assent with regard to the material term of the facility's price and that, accordingly, the option agreement was an unenforceable "agreement to agree." In support of this contention, MILP points to the trial court's finding that there was no "meeting

- 16 -

of the minds with respect to what was to be included in determining replacement cost for the facility." However, the option agreement expressly contemplated circumstances in which replacement cost would not be considered when determining a purchase price. Indeed, even in the absence of replacement cost, the contract provided a specific, detailed mechanism for determining the purchase price of the facility. Given that the parties expressly agreed to these terms, MILP's contention is without merit.

In order for a valid contract to form, the parties must objectively manifest their mutual assent to the essential terms of the contract. Yakima County Fire Prot. Dist. No. 12 v. City of Yakima, 122 Wn.2d 371, 388, 858 P.2d 245 (1993). The essential terms of an option contract for a sale of land include the parties, a description of the property, and a means for determining the purchase price. Neiffer v. Flaming, 17 Wn. App. 443, 446, 563 P.2d 1300 (1977) (citing Valley Garage, Inc. v. Nyseth, 4 Wn. App. 316, 481 P.2d 17 (1971)).

Here, the option agreement stipulated that the facility's purchase price would be the greater of the facility's "fair market value," "replacement cost," or "prospective fair market value" set forth in Schedule D. MILP contends that the plain language of the agreement required that each of these three valuation methods be considered in determining the final purchase price and that, accordingly, the trial court's finding that there was "no meeting of the minds" with respect to the meaning of "replacement cost" equates to a determination that the

parties failed to mutually assent to the essential term of the facility's price.[11]

Thus, MILP asserts, the option contract is unenforceable. We disagree.

Contrary to MILP's assertion, the option agreement did not require that all three pricing methods be utilized in determining the facility's final purchase price. Rather, the agreement contemplated that as few as one of the pricing methods could be sufficient. In order for either "fair market value" or "replacement cost" to apply, the parties were required to take timely, proactive steps. The agreement specified that if MILP and MRA were unable to agree upon a "fair market price" within 15 days of MRA's exercise of its option, then each party would be granted five additional days to appoint a disinterested appraiser to assess fair market value. MILP's selection of a disinterested appraiser to assess "replacement cost" was likewise to occur pursuant to this procedure.[12] In the event that no

---

[11] MILP further contends that the trial court's finding that there was no meeting of the minds regarding whether to include the value of MRA's business when determining the facility's fair market value also renders this pricing method unenforceable. However, this finding applied only to the question of whether the parties had agreed to include one particular factor among many that might be included when assessing fair market value. In contrast to the trial court's evaluation of "replacement cost," the court did not determine that this pricing method could not be given effect.

[12] The option agreement stipulated that "[r]eplacement cost shall be determined by the appraiser selected by MILP pursuant to the next succeeding paragraph, and shall be the amount included in the appraiser's appraisal report on the Facility." The next succeeding paragraph stipulated:

> MILP and MRA shall within five (5) days and the expiration of the fifteen (15) day period each promptly appoint an [sic] disinterested appraiser who is a member of the American Institute of Real Estate Appraisers (or any successor organization thereto) experienced in the appraisal of facilities like that of the Facility. The appraisers appointed, shall, within thirty (30) days after the date of the notice appointing the first appraiser, proceed to appraise the Facility to determine the Fair Market Value thereof as of the relevant date (giving effect to the impact, if any, of inflation from the date of their decision to the relevant date); provided, however, that if only one (1) appraiser shall have been so appointed, or if two (2) appraisers shall have been appointed but only one (1) such appraiser shall have made such determination within thirty (30) days after the appointment of the first

- 18 -

disinterested appraiser was selected by either party within the five-day period, the purchase price would be determined solely by Schedule D, which set forth the "prospective fair market value" of the facility. Accordingly, MILP is incorrect that the purchase price of the facility could not be determined in the absence of an evaluation of replacement cost.

Moreover, the option agreement expressly contemplated circumstances in which certain of its provisions might be found unenforceable. A broad severability clause provided that "[t]he invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted." Pursuant to this provision, the contract remained enforceable even after the pricing method based upon replacement cost was stricken. Indeed, even if both fair market value and replacement cost were severed from the agreement, the remaining contract would retain a valid method for determining the facility's price: namely, Schedule D of the option agreement.[13]

---

appraiser, then the determination of such appraiser shall be final and binding upon the parties.

[13] Furthermore, in this case, the trial court determined that MILP's appraiser, James Brown, was not a disinterested appraiser and that, accordingly, all of its opinions must be disregarded. The court explained that Aaron Brown, the appraiser assigned to evaluate the facility, had "abandoned his own independence and integrity" by following MILP's directions to change his final report. The trial court further noted that Brown had repeatedly violated the standards of professional appraisal practice, changed his assessment of construction quality in order to increase the facility's valuation, ignored his own inspector's report of water damage and construction defects, and arbitrarily backdated his report from September 24, 2008 to June 15, 2008. Contrary to MILP's assertion at oral argument, these actions by Brown related not only to the determination of fair market value but also to the determination of replacement cost.

Accordingly, no disinterested appraiser was timely appointed by MILP to calculate the facility's fair market value and replacement cost. As the trial court noted, in such circumstances,

Under the broad severability provision of the option agreement, the pricing method based upon replacement cost was properly severed from the contract. The remaining agreement set forth all the essential terms of a valid option contract, including a sufficient mechanism for determining the purchase price. The trial court did not err by enforcing this agreement.

The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with the rules governing unpublished opinions.

III

MILP next contends that the trial court erred by awarding consequential damages to MRA where, MILP asserts, the undisputed evidence establishes that MRA came into equity with unclean hands. We disagree.

"'[A] decree for specific performance seldom brings about performance within the time that the contract requires.'" Rekhi v. Olason, 28 Wn. App. 751, 757-58, 626 P.2d 513 (1981) (alteration in original) (quoting Restatement (Second) of Contracts § 365 cmt. d (1979)). Thus, when ordering specific performance, a court may also award consequential damages in order to make the nonbreaching party whole. Cornish Coll. of the Arts v. 1000 Virginia, Ltd. P'ship, 158 Wn. App. 203, 228, 242 P.3d 1 (2010). Such damages are not awarded for breach of the contract but, rather, "at the equitable discretion of the trial court." Cornish, 158 Wn. App. at 228.

---

it would be appropriate to rely solely upon Schedule D in setting the purchase price for the facility. Thus, based upon the facts of the case as well, the trial court properly determined that replacement cost was not a valid measure upon which to base the facility's valuation.

- 20 -

MILP is correct that "[e]quity jurisprudence requires the party seeking equitable relief to have acted in good faith and to come into equity with clean hands." Cornish, 158 Wn. App. at 216. In this case, however, the trial court expressly found that MRA performed all of its obligations under the option agreement in good faith. A trial court's findings of fact are reviewed for substantial evidence. In re Marriage of Chua, 149 Wn. App. 147, 154, 202 P.3d 367 (2009). Substantial evidence is the quantum of evidence sufficient to persuade a rational, fair-minded person that the premise is true. Sunnyside Valley Irrigation Dist. v. Dickie, 149 Wn.2d 873, 879, 73 P.3d 369 (2003).

Here, MILP claims that the trial court's finding that MRA acted in good faith was incorrect for two reasons. First, MILP contends that MRA acted in bad faith by asserting the right to exercise its option on a date that was later determined by the trial court to be premature. However, MRA's position on this issue hardly evidences bad faith. The language of the option agreement specified that the option period would commence on the eighth anniversary of "the commencement date of the Facility Lease Agreement."[14] MRA reasonably interpreted this language to indicate that its right to purchase the facility arose eight years after the lease agreement was signed. This claim was not found to be frivolous. The fact that a court ultimately concluded that the option period did not commence until eight years after a certificate of occupancy was issued in no way indicates that MRA's claim was brought in bad faith.

---

[14] The lease agreement specified that the "term of this lease" would commence upon the earlier of (1) "the issuance of a certificate of occupancy" or (2) MRA taking possession of the property. The lease agreement itself, however, was signed on October 21, 1999.

Second, MILP contends that MRA's bad faith was evidenced when, at trial, MRA's appraisers utilized a definition of "replacement cost" that excluded the value of the underlying land, a definition that, MILP asserts, MRA knew had been rejected during negotiations. However, there is scant evidence in the record that MRA "knew" that MILP's definition of replacement cost excluded the value of land. The lease agreement contained a definition of "full replacement cost" that did not include any reference to the underlying land. Indeed, the lone source of such a proposition was the testimony of MILP's owner and attorney, Keith Therrien, whom the trial court, as the sole judge of credibility, was entitled to either believe or disbelieve. In determining that MRA acted in good faith, the trial court implicitly rejected Therrien's version of events.[15]

The record does not support MILP's assertion that MRA came into equity with unclean hands. The trial court did not err by determining that MRA was entitled to equitable relief in the form of consequential damages.

---

[15] MILP asserts that negotiations regarding the language of the option agreement also demonstrate that MRA knew that any definition of "replacement cost" must include the value of the underlying land. MILP contends that MRA's own attorney initially proposed a definition of replacement cost that excluded the underlying land and that MILP specifically rejected this definition. However, it is far from clear that MRA proposed such a definition or that this definition was rejected because it excluded the value of the underlying land. The proposed language to which MRA points specifically references "Alzheimer's facilities," which MRA had no plans to include at the facility. The only party that did maintain facilities with Alzheimer's residents was Campbell Homes, the general partner of MILP. Thus, the evidence suggests that it was Campbell Homes which was the source of this language. Moreover, the reference to Alzheimer's residents rendered this definition of replacement cost inappropriate for the parties' option contract. Accordingly, it is unclear whether the rejection of this contractual language occurred because it excluded the value of the underlying land or because it referenced subjects not contemplated by the parties' agreement.

IV

MILP next contends that the trial court abused its discretion in determining the amount of consequential damages to which MRA was entitled. It asserts that it was error for the court to award, as consequential damages to MRA, MRA's lease payments from June 18, 2008 (the date upon which the court determined that MRA had exercised its option) to July 18, 2012 (the date upon which the court determined the purchase and sale agreement should be executed). The trial court found that MRA's lease payments to MILP would have "gone toward reducing [MRA's] underlying mortgage had [it's] attempts to purchase the facility not been frustrated by [MILP]" and that, accordingly, all lease payments during this period should be deducted from the facility's purchase price. On appeal, MILP asserts several challenges to the amount of this award. None have merit.

"[T]rial courts have broad discretionary power to fashion equitable remedies." SAC Downtown, Ltd. P'Ship v. Kahn, 123 Wn.2d 197, 204, 867 P.2d 605 (1994). The fashioning of such a remedy is reviewed for abuse of discretion. Niemann v. Vaughn Cmty. Church, 154 Wn.2d 365, 374, 113 P.3d 463 (2005). Accordingly, an award of consequential damages will not be disturbed absent a showing that the trial court's decision was "'manifestly unreasonable or exercised on untenable grounds.'" Cornish, 158 Wn. App. at 228-29 (quoting Paris v. Allbaugh, 41 Wn. App. 717, 720, 704 P.2d 660 (1985).

MILP first contends that MRA was entitled to no consequential damages for the period of June 18, 2008 to November 30, 2010. This is so, MILP contends, because until the latter date, MRA continued to assert that it had

- 23 -

properly exercised its option in 2007, a year in which the value of the facility was substantially lower. Until that dispute was resolved, MILP asserts, it would have been impossible to reach agreement on a purchase price and, thus, equally impossible for MILP to perform under the contract. Because consequential damages "must run from the date at which the contract required performance," Cornish, 158 Wn. App. at 229, MILP contends that no such damages should have been awarded for the period prior to November 30, 2010.

However, contrary to MILP's assertion, the record does not indicate that MRA was insisting upon a 2007 purchase price until November 2010. Indeed, in June 2009, MRA offered to purchase the facility for $19 million, a higher price than that set forth by Schedule D for the 2007 calendar year. Moreover, the trial court expressly determined that, although the parties remained at an impasse regarding the commencement of the option period, nothing precluded MILP from negotiating a purchase price or setting a closing date until that dispute was resolved. MILP assigns no error to these findings. Accordingly, MILP's assertion that performance was impossible prior to November 30, 2010 is without merit.

Similarly, MILP's contention that performance of the contract was prevented by MRA's "unproductive" investigation of Campbell Homes' relationship to James Brown is also unsupported by the record. There is no indication that MRA's discovery regarding this issue was unproductive. The trial court expressly determined that MRA's discovery efforts "contributed greatly to [its] determination to disregard the testimony of [MILP's appraiser]" at trial. The court explained that many of the same persons and entities comprising MILP had

longstanding involvement with Campbell Homes. Therrien, for instance, had for years served as Campbell Homes' attorney, during which time he had many dealings with James Brown appraisers. As the trial court found, evidence of such previous relationships was crucial to its determination that Aaron Brown's opinions had been improperly manipulated by MILP. This finding is supported by substantial evidence and, accordingly, MILP's contention provides no basis for overturning the award of consequential damages.

MILP next contends that it was error for the trial court to award the entire amount of MRA's rental payments to MILP as consequential damages to MRA. MILP asserts that if MRA had exercised its option in June 2008, then MRA would have been required to make substantial loan payments in order to finance its purchase. Accordingly, because the purpose of consequential damages is to place the nonbreaching party in the position that he or she would have been had the contract been performed, MILP contends that MRA is entitled to no more than the difference between its actual rental payments and the hypothetical costs of owning the property.

However, MILP does not dispute that MRA made over $6 million in rental payments to MILP after the date upon which the contract required MILP to sell the facility to MRA. MILP does not contend that it was somehow entitled to such rental payments. Thus, in order to place MRA in the position that it would have been had the contract been performed, it was necessary for MILP to disgorge these rental payments to MRA. See Cornish, 158 Wn. App. at 215 (affirming

award of rental payments as consequential damages). Such payments constituted, in effect, a down payment on the purchase price.

Moreover, had the sale of the facility occurred in June 2008 (as the contract required), MRA would thereafter have made substantial progress toward paying down any loan procured in order to purchase the property. MRA would have satisfied over four years of such obligations during the period that MILP delayed performance. Thus, for this reason as well, in order to place MRA in the position that it would have been had the exercise of the option been honored, a reduction in the purchase price was required.

Nevertheless, MILP contends that a seller who breaches a contract to sell real property is entitled to interest payments on the purchase price during the period of delayed performance. MILP notes that in similar circumstances, this court has held that a seller may be entitled to receive the value of his or her lost use of the purchase money during the period performance is delayed. Paris, 41 Wn. App. at 720. There is, however, no indication in the record that MILP ever requested such an accounting between the parties. MILP cites to no portion of the record in which it argued, as it does now on appeal, that the proposed award was inequitable.

Moreover, if MRA's consequential damages were to be reduced in such a manner, the award would "fall short of making whole the nonbreaching party, which is the purpose for which consequential damages are awarded." Cornish, 158 Wn. App. at 229-30 n.15. As noted above, MRA made over $6 million in lease payments to MILP after the date upon which it exercised its option.

Particularly given the trial court's determination that MILP acted in bad faith by deliberately attempting to prevent MRA from purchasing the facility, a reduction in MRA's award to cover MILP's losses would not be equitable.[16] The trial court did not err by awarding the full amount of MRA's rental payments to MILP as consequential damages.

## V

MILP next asserts that MRA's motion to amend the trial court's preliminary findings of fact and conclusions of law was untimely. It asserts that the filing of this instrument constituted an "entry of judgment" and that, accordingly, CR 52(b) required that MRA file its motion to amend within ten days of this document's issuance. We disagree.

Following a bench trial, a trial court is required to "find the facts specially and state separately its conclusions of law." CR 52(a)(1). A party may bring a motion asking the court to amend its findings or make additional findings "not later than 10 days *after entry of judgment*." CR 52(b) (emphasis added). CR 54(a)(1) defines a "judgment" as "the final determination of the rights of the

---

[16] MILP contends that the trial court erred by determining that MILP breached the implied covenant of good faith and fair dealing under the option contract. However, this finding is supported by substantial evidence. In evaluating MILP's intentions, the trial court explained:

[T]he refusal of [MILP] after that date to discuss pricing or a closing date, the repeated effort to lure [MRA] into meetings in which the only discussion was a refinance of the facility to allow them to acquire a minority interest, the lack of candor or recollection by Mr. Dye with regard to his efforts to stall and subvert their exercise of rights under the Option, and the concerted effort of [MILP] to inflate the purchase price through submission of the belated and altered appraisal of Aaron Brown, cumulatively can only be found by the court to have been a deliberate effort to prevent [MRA] from purchasing the facility.

The court's characterizations of MRA's conduct are amply supported in the record, and MILP does not and could not argue that such actions do not constitute bad faith. The trial court did not err by determining that MILP breached the implied covenant of good faith and fair dealing.

parties in the action and includes any decree and order from which an appeal lies." Judgments may be presented at the same time as the findings of fact and conclusions of law. CR 54(f)(1). However, "[n]o order or judgment shall be signed or entered until opposing counsel have been given 5 days' notice of presentation and served with a copy of the proposed order or judgment." CR 54(f)(2).

In determining whether a judgment has been entered, "substance controls over form." Nestegard v. Inv. Exch. Corp., 5 Wn. App. 618, 623, 489 P.2d 1142 (1971). MILP is correct that a reviewing court must look to an instrument's content and not to its title when evaluating the nature of the instrument. Nestegard, 5 Wn. App. at 623. Thus, in Nestegard, we explained that where an "order" purports to finally determine the rights of the party, stating that "Judgment be and it is hereby entered for the plaintiff and against the defendant," such an order is properly deemed a judgment, notwithstanding its title. 5 Wn. App. at 621.

Here, MILP asserts that the filing of Judge Bowden's findings of fact and conclusions of law constituted the entry of a "judgment" and that, accordingly, MRA's failure to move to amend these findings and conclusions within the ten-day time limit rendered the motion untimely. However, both the contents of this instrument and the circumstances of its filing belie this contention.

Following trial, Judge Bowden sent a letter to the parties enclosing copies of a document entitled "Findings of Fact and Conclusions of Law." Judge Bowden explained that rather than issuing a letter decision, he had drafted his

own findings in order to save the parties further disagreement and ongoing attorney fees. However, he noted, "[i]f either of you feel that specific additional findings or conclusions should be provided, I remain willing to entertain additional such requests." The parties were not served with notice that a judgment had been entered as is required by CR 54(f)(2). Nor did the findings and conclusions contain any operational language requiring the parties to take action. Instead, Judge Bowden simply signed and dated this document.

This instrument contained none of the hallmarks of a judgment. Indeed, its title accurately reflected its contents: the findings of fact and conclusions of law of the trial court. The instrument neither purported to finally determine the rights of the parties nor indicated that judgment had been entered. Judge Bowden himself specifically stated that he did not intend his findings and conclusions to be a "judgment." Because the filing of this instrument did not constitute an "entry of judgment," the ten-day time limitation set forth by CR 52(b) was inapplicable to MRA's motion. The trial court did not err by determining that the motion to amend was timely.

VI

MILP next contends that the trial court erred by determining that Campbell Homes was jointly and severally liable for MILP's breach of the option agreement. This is so, MILP asserts, because Campbell Homes was no longer the general partner of MILP on the date that MRA exercised its right under the option agreement to purchase the facility. We disagree.

- 29 -

A general partner is "liable jointly and severally for all obligations of the partnership unless otherwise agreed by the claimant or provided by law."[17] RCW 25.05.125(1). "A partner's dissociation does not of itself discharge the partner's liability for a partnership obligation incurred before dissociation." RCW 25.05.260(1). "One partner may not relieve himself of liability for past debts of the partnership merely by terminating the partnership." Hewitt Rubber Co. v. Thompson, 127 Wash. 363, 368, 220 P. 767 (1923). Rather, in order to avoid continued personal liability upon withdrawing from the partnership, the dissociated partner must generally obtain the agreement of both partnership creditors and the partners who will continue the business.[18] RCW 25.05.260(3).

An option contract is a "complete, valid and binding agreement by the terms of which a collateral offer is kept open for a specified period of time." Bennett Veneer Factors, Inc. v. Brewer, 73 Wn.2d 849, 853, 441 P.2d 128 (1968). The grantor of an option is "under a duty not to '*repudiate or make performance impossible or more difficult*.'" Thompson v. Thompson, 1 Wn. App. 196, 200, 460 P.2d 679 (1969) (quoting McFerran v. Heroux, 44 Wn.2d 631, 638, 269 P.2d 815 (1954)). Importantly, "[a]n option contract is binding upon the offeror and actually becomes a contract *before* the option holder decides whether or not to exercise the power." 25 DAVID K. DEWOLF ET AL., supra, § 2.16, at 53

---

[17] MILP was a limited partnership. In such a partnership, only the general partner is individually liable for the partnership's obligations. See, e.g., Dwinell's Cent. Neon v. Cosmopolitan Chinook Hotel, 21 Wn. App. 929, 934, 587 P.2d 191 (1978).

[18] Alternatively, "[a] dissociated partner is released from liability for a partnership obligation if a partnership creditor, with notice of the partner's dissociation but without the partner's consent, agrees to a material alteration in the nature or time of payment of a partnership obligation." RCW 23.05.260(4). MILP does not contend that anything of this nature occurred in this case.

- 30 -

(emphasis added) (citing Turner v. Gunderson, 60 Wn. App. 696, 807 P.2d 370 (1991)).

Here, MRA and MILP entered into the option agreement on October 21, 1999. On that date, Campbell Homes, as general partner, became obligated to sell the property upon MRA's exercise of its option. Under RCW 25.05.260(1), Campbell Homes remained jointly and severally liable for all obligations under the option agreement, even for breaches that occurred after it withdrew from the partnership on May 1, 2008. MILP's assertion to the contrary is without merit.[19] The trial court did not err by determining that Campbell Homes was jointly and severally liable for MILP's breach of the terms of the option contract.

VII

MILP's final contention is that the trial court erred by awarding MRA its attorney fees for discovery related to determining the relationship between Campbell Homes and James Brown appraisers. It asserts that, because MRA uncovered no evidence that Campbell Homes had undue influence over James Brown, this discovery was unproductive. MILP is correct that an award of attorney fees may be reduced for time spent on unsuccessful claims or theories. Bowers v. Transamerica Title Ins. Co., 100 Wn.2d 581, 597, 675 P.2d 193 (1983). Here, however, the trial court expressly found that MRA's discovery efforts contributed greatly to its decision to disregard the testimony of Aaron

---

[19] Although MILP is correct that a new purchase and sale agreement is formed upon the exercise of the option, this is irrelevant to the issue at hand. Here, it was the offer itself, contained in the option agreement, that MILP failed to honor. Accordingly, it is MILP's breach of the option agreement—and not of a secondary purchase and sale agreement—that gives rises to the liability in this case.

Brown. As discussed above, this finding is supported by substantial evidence. The trial court did not err by awarding attorney fees to MRA for time spent investigating the relationship between Campbell Homes and James Brown.

VIII

Both parties request attorney fees and costs on appeal. A contract that provides for attorney fees at trial also supports such an award on appeal. Atlas Supply, Inc. v. Realm, Inc., 170 Wn. App. 234, 241, 287 P.3d 606 (2012). Here, the option agreement stipulates that "[i]n the event of any action arising hereunder, the prevailing party shall be granted its attorneys fees and court costs." MRA has prevailed both at trial and on appeal. Accordingly, MRA is entitled to an award of reasonable attorney fees. Upon proper application, a commissioner of this court will enter an order awarding to MRA its fees and costs on appeal.

Affirmed.

We concur: